UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JET STAR ENTERPRISES LTD.,                  :

                                 :

             Plaintiff,              :

                                 :       05-CV-6585 (HB)

         -against-             :

                                 :       **Filed Electronically**

GEORGE SOROS, PERNENDU CHATTERJEE, :
DEUTSCHE BANK TRUST CO. AMERICAS,   :
AND MB STATUTORY TRUST,           :

                                 :

             Defendants.       :
-----------------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Submitted By:

Violet Elizabeth Grayson (VEG-2792)
Attorney at Law
270 Ninth Avenue
San Francisco, CA  94118
(415) 386-3367

Attorney for Plaintiff
Jet Star Enterprises, Ltd.

# TABLE OF CONTENTS

Introduction                                                                1

Statement of Facts                                                          2

Argument                                                                   21

I.  CS Aviation Possessed Assets Which Were Fraudulently
    Conveyed To and For the Benefit of the Defendants                      21

    A.  Circumstantial Evidence That CS Aviation Possessed Assets          22

    B.  James Walsh's Testimony That CS Aviation Possessed
        Between Two and Three Million Dollars In Cash One
        Week Before the July 25, 2003 Closing                             24

    C.  The Funds on Deposit in the Bleichroeder Account
        Belonged to CS Aviation and Were Fraudulently
        Conveyed to Deutsche Bank                                         26

    D.  The Funds On Deposit in the Operating Accounts of S-C
        Domestic Holdings III, IV, XVIII, XIX, XV, XII, XVI, XIII,
        XIV and XVII, and S-C Aviation Holdings VII, VIII, IX and
        XI, Totaling $740,333.65, Were Property of CS Aviation
        and Fraudulently Transferred To Deutsche Bank on
        July 25, 2003                                                     28

    E.  Expert Personnel, Intellectual Property, and Chattel of CS
        Aviation Were Conveyed to Windshear for the Benefit of
        Deutsche Bank                                                     30

    F.  Legal Interests Were Conveyed From CS Aviation To
        Deutsche Bank In Exchange For No Consideration
        Whatsoever                                                        31

    G.  Defendants Soros and Chatterjee are Liable for Fraudulently
        Transferring $594,337.93 to Akin, Gump's Trust Account
        for Their Own Benefit                                             32

II. Punitive Damages May Be Awarded In Cases of Intentional
    Fraudulent Transfer, And Are Justified Here By Defendants'
    Gross and Wanton Conduct                                              33

III. Plaintiff's Fourth and Fifth Causes of Action Have Merit      36

IV. Plaintiff's Sixth Cause of Action For Unjust Enrichment
    Has Merit      38

V. This Court Should Not Grant Summary Judgment on Plaintiff's
    Cause of Action to Pierce the Corporate Veil      42

    A.  Applicable Law      42

    B.  Application of Law to Facts      44

Conclusion      50

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

<u>111 East 88th Partners v. Simon</u>, 106 Misc.2d 693 (1980) ............................................... 33

<u>Bailey v. Diamond, Int. Corp.</u> 47 A.D. 2d 363 (1975) .................................................... 34

<u>Blakeslee v. Rabinor</u>, 182 A.D.2d 390 (1992) ............................................................... 34

<u>Borkowski v. Borkowski</u>, 39 N.Y.2d 982 (1976) ............................................................ 34

<u>Cadle Company v. Avrohom Newhouse</u>, 74 Fed. Appx. 152 (2d Cir. 2003) ............ 26, 27

<u>Chase Manhattan Bank v. Perla and Perla</u>, 65 A.D.2d 207 (1978) ................................. 34

<u>David v. Mast</u>, 1999 Del. Ch. LEXIS 34 ....................................................................... 43

<u>Dubrowsky v. Estate of Perlbinder</u>, 244 B.R. 560 (E.D.N.Y. 2000) .............................. 27

<u>Elwell v. Chamberlin</u>, 31 N.Y. 611 (1864) ................................................................... 34

<u>Fairchild v. McMahon</u>, 139 N.Y. 290 (1893) ................................................................ 34

<u>Fletcher v. Atex</u>, 68 F. 3d 1451 (2d Cir. 1995) .............................................................. 42

<u>Geyer v. Ingersoll Publications</u>, 621 A.2d 784 (D.Ch. 1992) ........................................ 45

<u>Goines v. Pennsylvania R.R.Co.</u>, 208 Misc. 103 (1955) ................................................ 33

<u>Hamilton v. Third Ave. R.R. Co.</u>, 53 N.Y. 25 (1873) .................................................... 33

<u>Harper v. F.S. & O Assoc., Inc.</u> 1992 U.S. Dist. LEXIS 21024 (S.D.N.Y. 1992) .......... 27

<u>Hassett v. Goetzman</u>, 10 F. Supp.3d 181 (N.D.N.Y. 1998) ..................................... 26, 27

<u>Huckle v. Money</u>, 2 Wils 205, 95 Eng. Rep. 768 [KB 1763] ......................................... 33

<u>In re Ames Dept. Stores, Inc.</u> 274 B.R. 600 ................................................................... 26

<u>In re Flutie</u>, 310 B.R. 31 (S.D.N.Y. 2004) .................................................................... 41

<u>In re Marrama</u>, 445 F.2d 518 (1st Cir. 2006) ................................................................ 27

<u>In re Rave Communications</u>, 138 B.R. 390 ................................................................... 43

In re Ticketplane.com, 313 B.R. 24 (2004) ..................................................... 43

Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983 (1987) ............................ 43

Keen v. Keen, 124 A.D.2d 938 (1986) ......................................................... 34

Mabon, Nugent & Co. et al. v. Texas American Energy Corp. et al., 1988 Del Ch. LEXIS 11; Fed. Sec. L. Rep. (CCH) P93 ............................................................. 43

Millard v. Brown, 35 N.Y. 297 (1866) ......................................................... 33

Morris v. Lawrence Mergenthaler et al., 1980 Del. Ch. LEXIS 546 ............................ 43

Nash v. Schock, 1998 Del.Ch. LEXIS 139 ...................................................... 43

Nationwide Life Ins. Co. v. Banker's Leasing Association, Inc., 182 F.3d 157 (2d Cir. 1999) ....................................................................................... 1

Orr v. Kinderhill Corp., 991 F.2d 31 (2d Cir. 1993) ......................................... 27

Passalacqua Builders et al. v. Resnick Developers South et al., 933 F.2d 131 (2d Cir. 1991) ................................................................................. 42, 44, 49

Rebh v. Rotterdam Ventures, Inc., 685 N.Y.S.2d 234 (A.D. 3d Dept. 1998) ..................... 43

RTC Mortgage Trust 995- N1 v. Sopher, 171 F.Supp.3d 192 (S.D.N.Y. 2001) .................... 32

Taylor v. Church, 8 N.Y. 452 (1853) .......................................................... 33

United States v. Golden Acres, Inc., 702 F.Supp. 1097 (D. Del. 1988) aff'd, 879 F.2d 860 (3d Cir. 1989) ........................................................................... 42-43

Walker v. Sheldon, 10 N.Y.2d 401 (1961) ...................................................... 33

**Statutes**

Federal Rules of Civil Procedure, Rule 56(c) ................................................. 1

**Other Authorities**

Barber, Piercing the Corporate Veil, 17 Willamette L. Rev. 371 (1981) ....................... 49

## Introduction

Defendants moving for summary judgment bear both the initial burden of production and the ultimate burden of persuading the court that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." (Federal Rules of Civil Procedure, Rule 56(c)) Because summary judgment is a "drastic device" cutting off a party's right to present its case to a jury, the moving party bears a "heavy burden" of demonstrating the absence of any triable issue of material fact. (Nationwide Life Ins. Co. v. Banker's Leasing Association, Inc., 182 F.3d 157, 160 (2d Cir. 1999)) Plaintiff's Opposition to Summary Judgment demonstrates, *inter alia*, that defendants engaged in an intentional fraudulent conveyance which placed the assets of judgment debtor CS Aviation Services Inc. ("CS" or "CS Aviation") beyond the reach of judgment creditor Jet Star Enterprises, Ltd. ("Jet Star"), and that defendants Soros and Chatterjee abused the corporate form in a fashion which justifies piercing the corporate veil of CS and holding these individual defendants liable for the corporation's debt to Jet Star. Defendants' motion for summary judgment should therefore be denied.[1]

---

[1] At this juncture in the proceedings, Plaintiff has weeded out its claims and elected to proceed only on those causes of action which offer the smoothest, straightest road to the desired destination. These are causes of actions 1, 2, 3, 4, 5, 6, and 11.

<u>Statement of Facts</u>

Beginning in the 1980's, individual defendants George Soros and Pernendu Chatterjee enjoyed what Soros termed "a general working relationship" covering a wide range of business interests. (Soros Deposition, Grayson Dec. Exh. 12, p. 11) Then, as Soros himself explains in his declaration submitted in support of the instant motion: "In the early 1990's, Dr. Chatterjee and I discussed the formation of an aircraft leasing business for which he would provide the management. Our discussions led to the formation of an aircraft leasing business that we referred to as "CS Aviation." (Soros Declaration, paragraph 4)

In 1994, Chatterjee arranged for incorporation of C-S Aviation, to manage the Chatterjee/Soros fleet of aircraft. (Chatterjee Deposition, Grayson Dec. Exh. 2, p. 10) Chatterjee was then, and remains to this day, the sole shareholder of this Delaware Corporation. (Chatterjee Affidavit in support of instant motion, paragraph 2) Chatterjee also served as a director of the corporation from its inception. (Chatterjee Deposition, Grayson Dec. Exh. 2, p. 64)

As for the aircraft themselves, a bank held bare legal title to each airplane as owner-trustee for FAA registration purposes. (Dahl Deposition, Grayson Dec. Exh. 4, pp. 16 and 60 et seq.) The beneficial ownership of the aircraft ascended through a complex chain of offshore entities to the ultimate beneficial owners who were Soros (personally), Chatterjee (personally), and certain investment funds which Soros and Chatterjee respectively controlled and invested in. (Chatterjee Affidavit Exhibit A; Walsh I Deposition, Grayson Dec. Exh. 13 pp. 60, 122-123; Walsh II Deposition, Grayson Dec. Exh. 14, pp. 29-31, 80 et seq.; Soros Deposition, Grayson Dec. Exh. 12, pp. 13 et seq., 60

et seq.) When money came in from the sale or lease of aircraft, CS "dividended up" the proceeds to the ultimate beneficial owners. This occurred "opportunistically" "as frequently as monthly or quarterly." (Walsh II Deposition, Grayson Dec. Exh.14, pp. 25 et seq.)

For several years, Chatterjee retained primary responsibility for the aircraft leasing business. As Soros explained: "he was in charge of managing these investments…once I had approved making those investments." (Soros Deposition, Grayson Dec. Exh. 12, p. 19) In late 1998, Soros came to a "parting of the ways with PC Chatterjee," whom Soros felt was receiving a "disproportionate share" of profits in exchange for his management services. (Soros Deposition, Grayson Dec. Exh. 12, pp. 12, 29) The general business relationship was, in Soros's words, "extremely complicated," and its termination "a very long, drawn out process, exactly, because of the complication." (Soros Deposition, Grayson Dec. Exh. 12, page 31)

The protracted "business divorce" of Soros and Chatterjee culminated in the informal "P.C. – G.S. Financial Agreement Terms Sheet" of December 1, 1998 (Chatterjee Affidavit Exh. E), which was subsequently embodied in a more formal "Restructuring Agreement." (Chatterjee Affidavit Exh. F) These documents effectively divided control of and equity in joint investments between Soros and Chatterjee. As George Soros explains in his current declaration: ***"With respect to the aircraft leasing business, the concept was that I would have complete control of the investment. After obtaining control of the investment, I delegated responsibility for the supervision of the management of the business to Frank Sica, the head of SFM's private equity team."*** (Soros Declaration, paragraph 6) Soros further explained, during the course of his

deposition, that "SFM" was Soros Fund Management, which he operated as a sole proprietorship until he ceded partial interests to two of his sons in or about 2004. (See Soros Deposition pp. 14-15, 37-38)[2] As demonstrated in great detail in the section of this brief dealing with plaintiff's veil-piercing claim, after taking control of the aircraft business, Soros operated the aircraft business as a whole, and C-S Aviation Services, Inc. in particular, with a singular disregard for the corporate form.

Shortly after Soros took control of the aviation business in early 1999, he attempted to sell the aircraft together with the management company. An "Allocation Agreement" (Grayson Dec. Exh. 16) executed by the investors in connection with the contemplated sale, defined the "Assets" to be sold as "all the capital stock of C-S Aviation" together with the aircraft. The Allocation Agreement further recited that although C-S Aviation Inc. was "wholly-owned by Chatterjee," "50% of the economic interest" in said company was "shared with Soros Fund Management." Morgan Stanley Dean Witter was retained to market the Assets, and prepared a C-S Aviation Services Confidential Information Memorandum (Walsh Affidavit Exh. A) for this purpose. The sale was not ultimately consummated.[3]

---

[2] Soros's counsel is apparently displeased with this portion of his client's testimony, and has interposed a series of "changes/corrections" to the sworn testimony, each of which begins with the statement "I am advised," and which assert that Soros Fund Management assumed a corporate form in the late 1990's and that Soros's information about the interests conveyed to his sons is inaccurate. Paragraph 5 of Soros's Declaration in support of the pending motion takes the same tack with the same "I am advised language." Any statement beginning with the words "I am advised" is hearsay, and the worst form of hearsay known to man or beast because it does not even identify the hearsay declarant. The so-called "corrections" therefore cannot alter Soros's testimony because they are inadmissible. What is more, even assuming, for the sake of argument, that the "changes/corrections" were not only admissible but also technically true, they would be of no evidentiary value. If Mr. Soros believed, at all times pertinent to this litigation, that Soros Fund Management was his sole proprietorship, he presumably operated it as such, in disregard of the corporate form. If the so-called "corrections" are probative of anything at all, they are probative of George Soros's contempt for corporate formalities and the corporate form of doing business.

[3] The assets may have been priced too high. Former CS Aviation Vice-President for Marketing, Gary Kincaid, in his recent deposition, recalled the sale price to be in the vicinity of half a billion dollars. (Kincaid Deposition, Grayson Dec. Exh. 9, p. 13)

After Morgan Stanley failed to produce a buyer, Soros adopted an alternate business strategy of selling off certain aircraft while refinancing others, and continuing to operate the business himself through Frank Sica of SFM. These business decisions ultimately led to the present lawsuit. To refinance the aircraft, Soros obtained a $210 million loan from a consortium of banks led by defendant Deutsche Bank's predecessor in interest, Banker's Trust. This loan was secured by some (but not all)[4] of the aircraft in the Soros-managed fleet, the capital stock of certain holding companies which indirectly owned these aircraft, and specified cash collateral accounts for each of these aircraft, which the borrowers were required to maintain on deposit with Deutsche Bank. (Bell Affidavit paragraph 4 and Exhibits A, B, C, and D) The loan transaction closed in September of 1999. (Ibid.) ***Significantly, CS Aviation Services, Inc. was not a party to the loan agreements, and owed the bank syndicate nothing at the close of the transaction.*** (Deutsche Bank Answer in Instant Action, paragraph 21; Walsh Affidavit, paragraph 37)

One month before the loan closed, in August of 1999, CS Aviation negotiated a sale of several Boeing 737-200 aircraft to Jet Star Enterprises, Ltd. The Aircraft Sale Agreement (Dahl Affidavit Exh. G) was executed by First Security Bank (predecessor to Wells Fargo Bank Northwest) in its capacity as owner-trustee of the aircraft. Regrettably, the sale transaction went awry. When Jet Star, which had already paid out approximately $4.2 million dollars, requested a two-week extension of time in which to make a final $460,000 payment, CS Aviation President James Walsh elected to retain Jet Star's deposit and attempted to resell the aircraft to another buyer. (See Dahl Affidavit Exh. N and Walsh I Deposition, Grayson Dec. Exh. 13, pp. 13-14) While Walsh believed that

---

[4] See Walsh Affidavit, paragraph 36.

this approach would produce the most revenue for Soros and Chatterjee, he misjudged the market and was unable to find another buyer willing to match the Jet Star contract price. (<u>Ibid.</u>) As a consequence, Jet Star sued the owner-trustee and CS Aviation, pleading causes of action for breach of contract, unjust enrichment, rescission, and equitable relief from forfeiture. (Dahl Affidavit Exh. N) The owner-trustee counter-claimed, asserting a cause of action for breach of contract. (Dahl Affidavit Exh. O) This litigation, which was filed in the Federal District Court for the Southern District of New York, and assigned to the Honorable Deborah Batts, is henceforth denominated "Jet Star I."

For a time, Jet Star I went forward in the ordinary way of commercial litigation. Sidley, Austin, Brown & Wood appeared for both defendants, and filed a Rule 12(b)(6) motion. The parties exchanged documents. On September 11, 2001, Sidley's offices in the World Trade Center were destroyed by aircraft, but the lawyers survived (along with the rest of Sidley's employees), and depositions were conducted in Sidley's midtown offices in the spring and summer of 2002. Then, in the spring of 2003, when the parties were poised to begin a round of summary judgment briefing, Sidley moved Judge Batts for leave to withdraw on the ground that its bills were not being paid. Jet Star's counsel was astonished by this turn of events, but the circumstances have become clear as a result of subsequent discovery. (Grayson Dec. paragraph 6)

As it turns out, the devastating impact of the September 11, 2001 terrorist attack on the entire aviation industry trickled down to CS Aviation. The aircraft leasing business, which had been profitable for years, turned unprofitable. (Soros Deposition, Grayson Dec. Exh. 12, p. 65) Aircraft lessees returned planes or stopped making scheduled lease payments. (Walsh Affidavit paragraph 39) New lessees or purchasers for

the aircraft could not be found. (Kincaid Deposition, Grayson Dec. Exh. 9, pp. 22-23) By the end of 2002, the aircraft leasing business was not generating sufficient revenue to service the Deutsche Bank loan. (Walsh Affidavit paragraph 41; Soros Affidavit paragraph 7)

At this juncture, George Soros was operating CS Aviation through a subordinate of Frank Sica's named Michael Pruzan. James Walsh, as President of CS Aviation, reported to Pruzan, who in turn reported to Sica, who in turn reported directly to George Soros. (Pruzan Deposition, Grayson Dec. Exh. 10, pp. 13-15, 29; Walsh II Deposition, Grayson Dec. Exh. 14, pp. 15, 33; Sica Affidavit paragraphs 3, 10) Diane Southwood-Smith, the CS Aviation financial analyst who acted as primary liaison between CS and Deutsche Bank, irreverently described Pruzan as "our handler." (Southwood-Smith Deposition, Grayson Dec. Exh. 11, p. 77)

Pruzan tried to remedy CS Aviation's financial woes by forcing CS to cut operating expenses, while attempting to restructure the Deutsche Bank loan.[5] In this connection, Pruzan fired Walsh's long-time lieutenant, Thomas Serry, whom Pruzan described as a "big expense" "whose expertise wasn't really needed,"[6] and instructed Walsh that he was to make no payments to third parties without Pruzan's approval. When Walsh presented Sidley Austin's bill for work on Jet Star I to Pruzan, he refused to approve it for payment. (Pruzan Deposition, Grayson Dec. Exh. 10, pp. 67-68)

As Walsh testified:

---

[5] Pruzan testified that for purposes of cutting expenses, Pruzan considered CS Aviation, Inc. and all the aircraft-owning companies as a single economic entity. (Pruzan Deposition, Grayson Dec. Exh. 10 pp. 50-51) As demonstrated in the section of this brief addressed to veil-piercing, Pruzan indeed viewed C-S Aviation and all of the aircraft owner companies as a single unit for all purposes.
[6] James Walsh promptly had a heart attack, delaying Seery's departure. (Pruzan Deposition, Grayson Dec. Exh. 10, pp 52-53)

> Q. (V.E. Grayson): I received a call from Ben Nagin over at Sidley & Austin saying that they wanted to withdraw from the case…because they weren't receiving communication from CS or payment.
>
> Do you know if that's true; did there come a time when you ceased to communicate with Sidley regarding the merits of the lawsuit?
>
> A. What I recall is that Soros instructed us not to use Sidley anymore for this.
>
> Q. Did there come a time when Soros instructed you not to pay Sidley?
>
> A. Yes.
>
> Q. When was that?
>
> A. Probably toward the end of 2002, second half of 2002.

(Walsh II Deposition, Grayson Dec. Exh. 14, pp. 32-33)

In the spring of 2003, efforts to restructure the Deutsche Bank loan failed and Deutsche Bank expressed its intention to foreclose on its collateral. Frank Sica and Michael Pruzan informed George Soros of the state of play and recommended that Soros not resist the foreclosure. Soros concurred in their recommendation. (Sica Affidavit paragraphs 8 and 9; Pruzan Deposition, Grayson Dec. Exh. 10, pp. 63, 70)

Also in the spring of 2003, James Walsh received a letter from Sidley, Austin indicating their intention to withdraw from the Jet Star I litigation. Walsh tried to persuade Sica and Pruzan to change their minds and pay Sidley, but to no avail. Walsh testified:

> Q. You received that letter and did you seek counsel of Michael Pruzan or Frank Sica or anybody else as to how to respond to that?
>
> A. Yes. We let them, I don't recall which, probably Michael, but we certainly let them know what transpired.
>
> Q. That you had received the letter?
>
> A. That we have received the letter.

Q. This is the letter to seek leave to withdraw from Sidley?

A. Yes.

Q. Did you discuss the letter with Michael or Frank?

A. I gave them a copy of it and I am sure we had discussions.

Q. What do you recall about the content of the discussions?

A. I basically did not change their mind about what they wanted to do or not do with Sidley as to leave them out of things.

Q. So did they instruct you to do nothing at this point?

A. Yes.

Q. And you did nothing?

Q. Right.

(Walsh II Deposition, Grayson Dec. Exh.14, pp. 35-36)

In March of 2003, CS Aviation, which had been consistently carrying a balance in the three to four million dollar range in its Citibank account,[7] opened an account with Natexis Bleichroeder, a relatively obscure bank with which George Soros was long personally associated,[8] and transferred most of its funds to this account.[9]

In mid-April of 2003, Sidley formally moved Judge Batts for leave to withdraw from the Jet Star I litigation, and on April 30, 2003, Judge Batts issued an order relieving Sidley and affording CS Aviation and owner-trustee Wells Fargo Bank Northwest, 45 days in which to appear by new counsel. Judge Batts' order expressly set out the time frame in which plaintiff Jet Star was to move for default if replacement counsel failed to

---

[7] See Grayson Dec. Exh. 20.
[8] See Grayson Dec. Exh. 44.
[9] The March 3, 2003 transfer and the Bleichroeder account are discussed in far more detail in the portion of this brief dealing with intentional fraudulent transfer.

appear. Sidley forwarded Judge Batts' order to James Walsh on May 1, 2003, and the

following day Walsh forwarded the order to Rick Holahan of SFM and to an attorney

named Bob Pees at Akin, Gump.[10] (Grayson Dec. Exh. 24)

Sidley attorney Benjamin Nagin verbally warned Walsh that CS Aviation was

going to be defaulted (Walsh II Deposition, Grayson Dec. Exh. 14, p. 39), but no one at

SFM whom Walsh talked to about the impending default cared. Walsh later expressed

himself thus: "Here is what I believe. This is – this all occurred at a point in time when

Soros was looking to pass remaining aviation interests for Soros and Chatterjee to

Deutsche Bank, and in my opinion, in my recollection, they viewed it as a Deutsche Bank

problem." (Walsh II Deposition, Grayson Dec. Exh. 14, p. 38) Walsh was distressed by

Sidley's withdrawal, and vented his frustration at a CS Aviation daily staff meeting.

(Kincaid Deposition, Grayson Dec. Exh. 9, pp. 143-145)

While Walsh struggled with Pruzan and Sica at the mid-town Manhattan offices

CS Aviation shared with SFM and George Soros,[11] downtown,  the syndicated bankers

were gearing up to grab everything in the vicinity of the Soros/Chatterjee aircraft they

could lay their hands on, regardless of whether it was pledged as collateral  for their loan

or not. The bankers were particularly interested in seizing the assets – tangible and

intangible – of CS Aviation, even though CS Aviation was not a party to the loan

agreement and did not owe the syndicated bankers a penny. General Motors Acceptance

Corporation ("GMAC") was a member of the syndicate[12] led by Deutsche Bank, and in

---

[10] George Soros testified at his deposition that Akin, Gump was his primary counsel, and that his key contact at Akin was a lawyer named Steven Vine. (Soros Deposition, Grayson Dec. Exh. 12, p. 106)
[11] As explained in greater detail in the veil-piercing portion of this brief, at this point in time, CS Aviation, SFM, and George Soros individually, were all sharing office space at 888 Seventh Avenue. Dr. Chatterjee subleased space from SFM on another floor. (Walsh Affidavit paragraph 26)
[12] See Kincaid Deposition, Grayson Dec. Exh. 9, pp. 36-37

early May of 2003, a GMAC representative, S. Patrick, lunched with David Bell of Deutsche Bank and outlined a plan for swallowing CS Aviation whole, as a functioning company, while changing its name to avoid liability.[13] At Bell's request, Patrick prepared a memorandum summarizing the proposal. The Memorandum, entitled: "C-S Aviation - Required Action," contains the following recommendations:

- Retain current management (without contract) to facilitate orderly transition to new management (up to six months). I recommend that we do not inform Walsh that he will be replaced at this time. The new president will determine who else on the current staff to retain and whom to replace.
- Instruct legal counsel to establish new legal structure and ownership interests of New Management Company *(rename)*.
- Secure agreement with Soros to allow current management to remain in the current offices for up to six months.
- Install a "forensic accountant" to *identify all assets belonging to CS, including cash, office equipment, etc.* This accountant should be an employee of the lending group (new owners)…

    It is our opinion that Walsh is a detriment to the on-going success of the business. He should only be retained long enough so a new president can extract the institutional memory he retains. *CS Aviation (under a new name) can once again be a viable entity.*

(Grayson Dec. Exh. 22. Emphasis added.)

Pursuant to the foregoing plan, David Bell of Deutsche Bank asked James Walsh to form a company to be known as "DBG[14] Aviation Services," to serve as a successor to CS Aviation, with the same employees. (Kincaid Deposition, Grayson Dec. Exh. 9, p. 30) Walsh, however, proved unexpectedly obstinate, demanding a contract and a management fee based on a set percentage of receipts. (Kincaid Deposition, Grayson Dec. Exh. 9, pp. 42-43) According to Gary Kincaid, CS Aviation's long-time Vice

---

[13] As explained in greater detail (with evidentiary citations) later in this brief, CS Aviation was sued frequently in its capacity as aircraft manager. At the time of Patrick's conversation with Bell, CS Aviation was being sued by both Jet Star and TACA Salvadoran Airlines. Not long thereafter, it was sued by Tradewinds.

[14] Perhaps an acronym for "Deutsche Bank General."

President for Sales and Marketing, the negotiations continued for about six weeks, and during this time, Bob Beckett of GMAC approached Kincaid and secretly opened parallel negotiations. (Kincaid Deposition, Grayson Dec. Exh. 9, pp. 36-37)

While senior CS personnel negotiated with the lenders concerning the successor management company, lawyers negotiated other aspects of the foreclosure. The lenders were represented by the Bingham McCutcheon firm under the leadership of partner, Mark Fucci. The borrowers were represented by the Akin Gump firm under the leadership of partner, Ronald Goldberg. Goldberg was assisted by a senior associate, Edward Christian and a junior associate, Thomas Gaynor. According to Mr. Christian, who billed the most hours on the transaction, the client was George Soros and the matter was "CS Aviation." (Christian Deposition, Grayson Dec. Exh. 3, p. 14)

The issues the lawyers negotiated included disposition of certain pending litigation, including Jet Star I and another Southern District case in which Wells Fargo Bank Northwest, in its capacity as owner-trustee, sued TACA Salvadoran Airlines for breach of an aircraft lease, and TACA sued CS Aviation for fraudulent misrepresentations concerning the aircraft (hereafter the "TACA Litigation"). Ronald Goldberg sought to retain the two litigations as assets "on behalf of CS Aviation Services, Inc."[15] Mark Fucci, however, demanded assignment of the two litigations to Deutsche Bank. Fucci eventually had his way. (See Bell Affidavit Exh. G, Acceptance Agreement, paragraph I.5 and attached Durable Power of Attorney executed by James Walsh in his capacity as President of CS Aviation.)

---

[15] Goldberg testified in full that he sought to retain the two litigations on "behalf of C-S Aviation Services Inc. plus whatever other SC or PG entity might have been a plaintiff or a defendant." In fact, no other SC or PG entity was party to either Jet Star I or the TACA Litigation. The presence of any of these offshore entities would have destroyed diversity jurisdiction.

While the parties continued to negotiate, the deadlines established by Judge Batts'

order in Jet Star I came and went, and no counsel appeared on behalf of the defendants.

Jet Star filed a motion for entry of default judgment within the time frame established by

the order. While the motion was pending, Joshua Dorchak, a litigation associate from the

Bingham firm, telephoned Jet Star's counsel, explained that he represented an unnamed

party who was going to "step into the shoes of CS Aviation," and requested that

plaintiff's counsel refrain from moving for a default. Plaintiff's counsel informed

Dorchak that the request for entry of default had already been filed. (Grayson Dec.

paragraph 8) On July 15, 2003 a default judgment was entered in favor of Jet Star and

against CS Aviation and Wells Fargo Bank in the amount of $3,432,867.[16]

Upon learning of the judgment on July 17, 2003, Ronald Goldberg shot off an e-

mail to Mark Fucci:

> I know you are out of the office. I hope Ana or your litigator has spoken with you
> re Jet Star. A default judgment was entered on 7/15 **which will become live on
> 7/25.** With interest, the judgment is about $3.4MM. I understand the banks are
> still working out logistical issues on the management side, but it is imperative that
> we close asap and your firm appears in this case and attempts to get the judgment
> vacated. Both of our litigators feel it is necessary to send the judge a joint letter
> indicating a specific closing date prior to 7/25 with the understanding that
> Bingham will appear following the closing. If we fail to do this, once the
> judgment becomes unstayed, theoretically the plaintiff can attach assets of CS **if it
> can find them**. I will be around today and tomorrow if you would like to talk.
> Thanks, Ron.

(Grayson Dec. Exh. 25. Emphasis added.)

Once the default judgment was entered, the defendants proceeded in haste.

Deutsche Bank gave Gary Kincaid the nod, and on Friday, July 18, 2003, the day

following the Goldberg e-mail, Kincaid incorporated Windshear Leasing in the state of

---

[16] This sum constituted the money paid out by Jet Star, less the contract value of the one airplane Jet Star
received, plus statutory interest computed from the time of payment. (See Dahl Affidavit Exh. N.)

Delaware. (See Grayson Dec. Exh. 26)  Over the weekend, Michael Pruzan telephoned James Walsh at his home in Virginia, "terminated" him, and told him not to come back to the office. (Pruzan Deposition, Grayson Dec. Exh. 10, p. 87; Walsh II Deposition, Grayson Dec. Exh. 14, pp. 52 et seq.) Walsh thought that he was told not to come in to the office because he might be "throwing a wrench in the works." (Walsh II Deposition, Grayson Dec. Exh. 14, p. 62)

The following Monday, July 21, 2003, counsel from Akin, Gump and Bingham McCutcheon had a conference call to discuss "C-S Aviation/Jet Star." (Grayson Dec. Exh. 27 and Goldberg Deposition, Grayson Dec. Exh. 7, p. 135) As demonstrated by subsequent events, the strategy adopted during this conference call was not to seek judicial relief from the judgment against CS Aviation, but rather to fraudulently convey all CS Aviation assets before the judgment "went live." No motion for relief from default was ever filed on behalf of CS Aviation. (Goldberg Deposition, Grayson Dec. Exh. 7, p. 149) Instead, the lawyers moved at break neck speed to close the transaction. As Edward Christian frankly testified at this deposition, Friday, July 25, 2003 "was a deadline we were going toward relating to a judgment that was entered." (Christian Deposition, Grayson Dec. Exh. 3, p. 144)

On July 23, 2003, Akin junior associate Thomas Gaynor sent an e-mail to a long list of interested parties, stating that the "formal closing call for the C-S Aviation Services, Inc. aircraft transfer" would begin the following afternoon at 1 p.m. (EDT), and that "this call may take some time as the wire transfers and authorization clearances may be somewhat cumbersome." Late the following day, Ronald Goldberg sent an e-mail to

Edward Christian and two other people at Akin Gump, stating: "The deal failed to close today, despite a 7 hour closing call. It must close tomorrow." (Grayson Dec. Exh. 30)

Also on the evening of July 24, 2003, James Walsh engaged in an exchange of e-mail with Edward Christian. Walsh wrote to Christian: "I still don't understand why Soros is turning over defense of the Jet Star litigation to a disinterested party. In conjunction with that, the document ["Acceptance Agreement" to be signed the following day] indicates that the banks are entitled to any proceeds from the litigation (which are likely to be limited to attorney's fees if we prevail.). ***Who will be responsible for payment if the lawsuit is lost?***" Christian wrote back: "1. All parties know C-S Aviation is a defendant in Jetstar, but it is still part of the settlement as the banks believe their funds are atrisk [sic] if judgment is entered against C-S in that case;. ***2. After the closing CS Aviation should not care if judgment is entered against it as there will be no assets and no bodies remaining…***" (Grayson Dec. Exh. 30. Emphasis added.)

The following day, Friday, July 25, 2003, the transaction closed. The parties executed a thick compendium of documents organized under a cover bearing the title: CS Aviation Services, Inc. Aircraft Transfer Closing Documents, July 25, 2003. The documents did a great deal more than transfer title to aircraft. They gutted CS Aviation, leaving behind an empty corporate shell. The so called "Acceptance Agreement," which was the key document in the packet (Bell Affidavit Exh. G), terminated forthwith all the "managers, officers, directors and employees" of CS Aviation. (See Acceptance Agreement, paragraph I.4) Per paragraphs I.5 and I.6 of the Acceptance Agreement and a related Irrevocable Power of Attorney, CS assigned to defendant Deutsche Bank (in its capacity as Administrative Agent for the syndicate of lenders) the right to control and

retain the receipts from Jet Star I and the TACA case, collectively defined by the Acceptance Agreement as the "Litigations." Per paragraph I.7 of the Acceptance Agreement, CS gave up its valuable aircraft management agreements, without benefit of the 60 days notice of termination required by those agreements. Per paragraph II.5 of the Acceptance Agreement, CS gave up its office space and office equipment. Per paragraph II.4(d) of the Acceptance Agreement, CS gave up any and all claims it might have against the banks or the aircraft-owning entities.

Edward Christian described the overall impact of the Acceptance Agreement on CS Aviation at his deposition (with a little coaxing from plaintiff's counsel):

Q. After the closing documents were executed on July 25, 2003, did your client, C-S Aviation, continue to exist?

A. I would be conjecturing.

Q. I'm asking for your understanding. You drafted the document. You know what it did. What's your understanding of its effect?

A. My understanding is that CS would exist as an entity but would have no employees or management to be able to make decisions as an entity, so it couldn't do any business, effectively. It had no one to guide it. It had no people. A company is made up of people, and there were no people left after July 25, 2003. So, if it existed, which I believe it did exist – that's a belief I have – it had no ability to do anything with its existence or any assets or liabilities that it may or may not have had.

(Christian Deposition, Grayson Dec. Exh. 3, p. 118)

Because the  Acceptance Agreement gutted CS Aviation in this fashion, the Closing Documents also included an Escrow Agreement (Bell Exh. G, Bates stamp Nos. DB 0051 et seq.), pursuant to which CS agreed to deposit in an escrow account, with Akin, Gump acting as escrow agent, the sum of $594, 337.93, to cover severance

payments for the CS Aviation employees, as well as payment of Akin's own bill,[17] payment of defendant Wells Fargo's legal bill, CS Aviation's July rent (due to defendant Soros)[18], and such other mundane items as payroll tax and postage. In other words, every future bill which might be anticipated among friends, but not CS Aviation's outstanding judgment debt to Jet Star. Moreover, as a condition of receiving their severance payments, the CS employees were required to sign a document releasing Soros and the other parties involved in the transaction from liability, and promising to hold confidential all information concerning CS Aviation. (Kincaid Deposition, Grayson Dec. Exh. 9, p. 57) The $594,337 was in fact deposited in escrow by CS on July 25, 2003, and subsequently paid out in the manner contemplated by the Escrow Agreement. (See Southwood-Smith Deposition, Grayson Dec. Exh. 11, pages 69-70)

A third important component of the transaction was the aircraft Management Services Agreement under which Windshear Leasing would begin managing the fleet. This document (Grayson Dec. Exh. 32) was executed by David Bell of Deutsche Bank on July 25, 2003, and required Windshear to manage the fleet in exchange for pre-set monthly compensation plus reimbursement of certain expenses. Significantly, the Management Services Agreement rendered Windshear a captive company insofar as the Agreement prohibited Windshear from providing aircraft management services to anyone but Deutsche Bank. (See Agreement paragraph 2(c))

One further feature of the entire transaction is worthy of note. The lenders did not foreclose on the aircraft or even on their cash collateral. Instead, they took title to limited

---

[17] In fact, *Soros* was Akin's client (Christian Deposition, Grayson Dec. Exh. 3, p. 14), but at the last minute, Goldberg had his colleagues doctor up a bill for $25,000, so that Akin could get something out of the escrow account. (See Grayson Dec. Exh. 29)

[18] See discussion, <u>infra</u>, p 49.

liability interests in certain aircraft owning entities and placed these interests in a Delaware Trust. (Acceptance Agreement, Bell Affidavit Exh. G, paragraph I.3) Acceptance of the limited liability interests was deemed to be in satisfaction of only $10,000.00 out of the $147 million owed to the lenders. (Ibid.) Yet George Soros and the Soros-related entities received releases under the transaction. Indeed, even when $2,714,504 cash was wire transferred from the Bleichroeder account to Deutsche Bank,[19] Deutsche Bank refused to acknowledge any payment against the loan. As David Bell of Deutsche Bank counseled an accountant inquiring about the status of the Bleichroeder funds in September of 2003: "No debt has been paid down and the nature of it has not changed; the entire $147 mn continues to be outstanding and should remain on the books. The payments at closing were not applied to either principal or interest…" (Grayson Dec. Exh. 34)

So ended the marathon C-S Aviation Services closing of July 25, 2003. One might have imagined that in the wake of this event, CS Aviation would cease to operate. Nothing could be further from the case. On Monday morning, July 28, 2003, the very CS Aviation employees who received nearly half a million dollars in "severance" payments in exchange for signing release forms which guaranteed their silence, reappeared in their old office, sat down at their old desks, and continued managing the same aircraft they were managing on Friday afternoon. They even got to keep their CS Aviation staplers and computers. (Southwood-Smith Deposition, Grayson Dec. Exh. 11, pp. 29-34; Kincaid Deposition, Grayson Dec. Exh. 9, pp. 54, 65) The employees held exactly the same positions and titles on Monday morning that they did on Friday afternoon. (Kincaid Deposition, p. 52) They had access to the same files on Monday morning that they did on

---

[19] This aspect of the transaction is discussed at greater length infra.

Friday afternoon. (Kincaid Deposition, p. 55) "Windshear" also inherited the CS Aviation telephone number, which was an extension in the SFM telephone system.[20] (Kincaid Deposition, p. 70) E-mail was "forwarded" from "CS" to "Windshear." (Kincaid Deposition, p. 73)

Returning to the Jet Star I Litigation downtown, while CS Aviation never moved for relief from default – having instead adopted a strategy of corporate disappearance and "renaming" – owner-trustee Wells Fargo Bank Northwest *did* retain counsel and move for relief from default under Federal Rule of Civil Procedure 60(b). The motion was duly briefed, and on February 23, 2004, Judge Batts denied relief from default. In so doing, Judge Batts cited, as one reason for denying relief, Wells Fargo's failure to articulate any meritorious defense to Jet Star's breach of contract claim. (Grayson Dec. Exh. 35, p. 15)

Jet Star has endeavored in various ways to execute on its judgment against CS Aviation and Wells Fargo Bank as owner-trustee. As regards trustee Wells Fargo, the trustee's counsel, John Karesh, informed plaintiff's counsel that there were no trust assets in the trustee's possession from which plaintiff might satisfy its judgment. (Grayson Dec. paragraph 10) At her recent deposition, Wells Fargo Trust Department Vice-President Nancy Dahl confirmed that the trust never contained any cash or assets other than bare legal title to aircraft. The aircraft were all sold while the Jet Star I Litigation was pending. (Dahl Deposition, Grayson Exh. 4, pp. 16, 62, 72)

As regards collection from CS Aviation, plaintiff tried unsuccessfully to locate and garnish CS Aviation bank accounts. (Grayson Dec. paragraph 10) When this approach failed, Jet Star's then local counsel, Marvin Wexler, attempted to contact CS

---

[20] After November 1, 2003, at which time "Windshear" moved offices, callers to the CS Aviation telephone number heard: "You have reached a non-working number at Soros Funds Management. For further assistance for Windshear Leasing, please call (212) 856-6250." (Grayson Dec. Exh. 39)

Aviation to arrange for a debtor's examination. Upon calling the CS Aviation telephone number in early 2004, he heard a recording stating: "You have reached a non-working number at Soros Funds Management. For further assistance for Windshear Leasing, please call (212) 856-6250." (Grayson Dec. Exh. 39) When Wexler telephoned this number, the person answering the telephone told Wexler that ***"CS has changed its name to Windshear Leasing . . ."*** Plaintiff's counsel then prepared deposition subpoenas for Windshear Leasing and for Diane Southwood-Smith, who identified herself as a responsible person associated with Windshear. These subpoenas were served in March and April of 2004, and set the deposition of Windshear Leasing for May 14, 2004. (Grayson Dec. Exh. 40)

On April 23, 2004, Windshear Leasing closed its doors because, a few days earlier, Deutsche Bank gave Gary Kincaid notice that "the management of the aircraft was going to be transferred to a company up in Connecticut." (Kincaid Deposition, Grayson Dec. Exh. 9, pp. 78-79) The close temporal relationship between service of the subpoenas and the wind-up of Windshear Leasing suggests that Deutsche Bank may have been trying to cover its tracks. It appears unlikely that Windshear was terminated for poor performance, as it was successfully leasing aircraft (Kincaid Deposition, p. 82), and Deutsche Bank extended the Management Services Contract beyond the original "Engagement Period," which terminated on December 31, 2003. (See Grayson Dec. Exh. 32, paragraph 5(a), p. 7) Deutsche Bank was more successful than Jet Star in its judgment collection efforts.  In January of 2004, it received approximately $23 million from TACA Salvadoran Airlines. (Bell Affidavit paragraph 30)

C-S Aviation Services, Inc. is now living out its corporate existence as an empty shell, without directors, officers, employees or assets. Each year, Chatterjee Management Company pays its fees and taxes to the state of Delaware. (See Grayson Dec. Exh. 41) C-S Aviation continues to receive its mail care of Chatterjee Group attorney, Marc Aronowitz, at 888 Seventh Avenue (office space subleased from SFM).[21] (See Grayson Dec. Exh. 41, and Walsh Affidavit paragraph 26) A letter mailed to CS Aviation at this address on March 4, 2004, by the New York State Department of Labor states: "On the basis of information received, we have processed a partial transfer of experience from your account to Windshear Leasing LLC, Employer Registration Number 46-58149, effective July 21, 2003. ***This is in keeping with the provisions of the New York State Unemployment Law, which provides for a transfer of experience when one employer acquires in whole or in part, the business of another***." The amount of the rescinded tax bill was $27,500.00. (Grayson Dec. Exh. 38. Emphasis added.)

Argument

I.

CS Aviation Possessed Assets Which Were Fraudulently Conveyed To and For the Benefit of the Defendants

Notwithstanding all the badges of fraud and evidence of fraudulent conveyance described in the foregoing Statement of Facts, defendants urge that no fraudulent conveyance occurred because CS Aviation possessed no assets at any time pertinent to this action. This is simply not true. As demonstrated below, in the spring and summer of 2003, CS Aviation possessed substantial assets, including cash, chattel, and other legal

---

[21] The scenario evokes the final scenes of Edith Wharton's *Ethan Frome*.

and intangible interests, all of which were conveyed away to Deutsche Bank and other parties, for the benefit of the defendants in the July 25, 2003 transaction.

A. Circumstantial Evidence That CS Aviation Possessed Assets

At his deposition, Ronald Goldberg testified that he investigated the assets of CS Aviation in connection with his representation of that company in the spring and summer of 2003, and that he completed this investigation of CS Aviation's assets before July 17, 2003, the day on which he wrote his e-mail to Mark Fucci stating that a judgment had been entered against CS Aviation, which went "live on 7/25," and warning that "the plaintiff can attach assets of CS if it can find them." (See Goldberg Deposition, Grayson Dec. Exh. 7, pp. 64-65, and Grayson Dec. Exh. 25) The urgent tone of the memorandum ("it is imperative that we close asap") strongly suggests that CS Aviation *did* have substantial assets. And Goldberg should know as he had just completed his investigation of that very subject.

Richard Holahan, an attorney employed by SFM, also opined that, as a matter of common sense, CS Aviation must have had some assets in the first half of 2003:

Q. Let's focus on the year 2003. Did C-S have assets in 2003?"

A. Sorry, in what part of '03?

Q. The first half of '03.

A. The first half of '03. I imagine it did have some assets because it had employees and it must have been paying those employees. So you know –

Q. Where were those assets kept in CS Aviation's assets in the first half of 2003?

A. It would be an assumption, you know, I would assume in CS Aviation bank accounts.

Q. Bank accounts?

A. Yeah, to the extent we are talking about cash. There are various kinds of assets.

Q. What other assets does CS Aviation have besides cash in the first half of 2003?

A. Well, I imagine they had furniture because I was at their offices at one point, you know, and supplies. The general things that an office requires to conduct business.

Q. Did they have valuable management contracts in the first half of 2003?

[Objections interposed and witness departs to celebrate wife's birthday.]

(Holahan Deposition, Grayson Dec. Exh. 8, pp. 61-63)

When his deposition continued the next day, Holahan added to the foregoing testimony, explaining that there was a "CS side of the ledger" and an advisee side of the ledger. (Holahan Deposition, p. 87) "As with any manager-advisee relationship, the management company had its own accounts and the advisees, in this case the aircraft holding companies, had their own accounts." (Holohan Deposition, p. 89)

Also of interest, Carlos Arteaga, CS Aviation's Comptroller, testified that he administered both bank accounts inside the Deutsche Bank debt facility and bank accounts outside the debt facility. (Arteaga Deposition, Grayson Dec. Exh.1, pp. 118-119) Ordinarily, funds inside the debt facility were maintained in Deutsche Bank accounts, and Arteaga could not think of any reason why any account maintained at another bank would be inside the debt facility.[22] (Arteaga Deposition, Grayson Dec. Exh. 1, p. 135)

---

[22] See also Grayson Dec. Exh. 18 (CS Funding Request of May 23, 2001), demonstrating that CS maintained substantial funds outside the debt facility.

At his deposition taken in June of 2004, former CS Aviation President James Walsh testified that CS Aviation had a sum in the vicinity of two to three million dollars on deposit in its operating account when he was "terminated" by Michael Pruzan, on the weekend prior to the July 25, 2003 Closing:

Q. When was the last time – did you ever see the final accounting for CS Aviation, the final accounting to which you just referred, where some went into Deutsche Bank, some into escrow?

A. No. I had seen some earlier drafts before while I was still in New York, but I don't think I ever saw the final account.

Q. Went [sic] was the last draft that you saw, if you recall.

A. I would guess it was the week that ended the 18th of July.

Q. Can you tell me in a range of magnitude, not to the penny, how much money Deutsche Bank was going to receive under that last draft you saw?

A. I can't recall specifically. As I said before, it could have been a couple of million dollars more than this 594,000.

\* \* \* \* \* \* \*

*Q: Do you remember, what's the last you remember about how much cash CS had on hand when you left the office, to the best of your recollection, in its operating account?*

*A. Well, as I said, the number that sticks in my mind is a couple of million dollars and if you have another 600,000 there probably would have been between two and three million.*

Q. So you think there was between two and three million dollars in the week of the 18th?

A. Yes, but I can't swear to that.

Q. To the best of your recollection, the amount on hand was between two and three million the week of the 18th of July, 2003?

A. As far as I can recall.

(Walsh II Deposition, Grayson Dec. Exh. 14, pp. 63-65)

* * * * * * *

In his declaration submitted in support of the pending motion for summary

judgment, Walsh now offers the following apparently contradictory testimony:

> CS Aviation maintained a bank account in its name at Citibank ("CS Operating
> Account") that generally held enough cash to cover CS Aviation's monthly
> operating expenses such as rent, vendor invoices, and salaries of its employees.
> The balance of the CS Operating Account typically ranged from $50,000 to
> $100,000. True and correct copies of monthly account statements for the CS
> Operating Account for April 2003 through July 2003 are annexed hereto as
> Exhibit B.

(Walsh Dec. paragraph 20)

The foregoing testimony was carefully crafted by Soros and Deutsche Bank to

mislead the Court. The choice of April as the opening month for Walsh Exhibit B is no

accident. The balances shown on the bank statements for the CS Operating Account

beginning in the month of April 2003 are relatively low because **on March 3, 2003, CS**

**Aviation transferred $3,999,240 from the CS Aviation Operating Account at Citibank**

**to Natexis Bleichroeder**. (See Grayson Dec. Exhibit 20 (CS Aviation Citibank Account

Ledger Showing money transferred to Bleichroeder account on March 3, 2003); Grayson

Dec. Exh. 21 (Natexis Bleichroeder Account Ledger showing funds arriving from

Citibank on March 3, 2003)) This transfer reduced the balance in the CS Aviation

Operating Account from $4,049,389 to $35,157.[23] Prior to the Bleichroeder transfer, the

---

[23] *There can be no doubt that the column entitled "Total CSAV Balance" on the "Citibank CSAV"*
*ledger attached to the Grayson Declaration as Exhibit 20 is exactly the same thing as the "Ledger*
*Balance" shown on the C-S Aviation Services Inc. Operating Account statements from Citibank*
*annexed to the Walsh Affidavit as Exhibit B. On a day-to-day basis, the figures correspond to the penny.*

balance in CS Aviation's Citibank Operating account generally fluctuated in the three to four million dollar range. (See Grayson Dec. Exh. 20)[24]

### C. The Funds on Deposit in the Bleichroeder Account Belonged to CS Aviation and Were Fraudulently Conveyed to Deutsche Bank

Deutsche Bank urges that the monies on deposit with Natexis Bleichroeder in the total amount of $3,308,841 as of July 25, 2003, which were transferred to Deutsche Bank ($2,714,504) and the Akin, Gump Trust Account ($594,337), were collateral for their loan simply because these accounts were in the names of CS Newco and PG Newco. In support of this proposition, Deutsche Bank cites the case of In re Ames Dept. Stores, Inc, 274 B.R. 600, 617, for the proposition that: "As a general rule, once funds are deposited in a bank account, the account holder is presumed to have title and control over those funds." (Deutsche Bank Memorandum of Points and Authorities at 13) As defendants well know, the presumption that funds on deposit belong to the named account holder is but a rebuttable presumption. The key question in a fraudulent conveyance case is where the funds came from – i.e. tracing. In legions of fraudulent conveyance cases, funds on deposit in the bank account of a non-debtor party are traced back to the debtor, the name on the bank account is disregarded, and a fraudulent transfer is found to have occurred.[25]

---

[24]Moreover, even a cursory glance at the Citibank CS Aviation Operating Account Statements annexed to the Walsh Affidavit reveals that it is not a vanilla operating account. Debits and credits in amounts of approximately $200,000 waft back and forth between the Citibank CS Aviation Operating Account and a bank account in Nassau, Bahamas, for no disclosed reason. Contrary to Walsh's representation, balances in the account range from about $200,000 positive to about $164,000 negative. The total activity on the account in April of 2003 approached $3 million, and the total activity on the account in May of 2003 approached $2 million.

[25] The March 3, 2003, transfer may well have been designed to conceal funds from Jet Star. The transfer bore multiple badges of fraud. While most of the Citibank CS Aviation Operating Account ledger debit entries show a mundane explanation for the debit, such as payroll or payroll tax, the Bleichroeder transaction is simply described as a "transfer." (Grayson Dec. Exh. 20) It further appears that the Bleichroeder accounts were opened expressly to receive the money transferred from CS Aviation's Citibank Operating Account. (See Bleichroeder Statements, Walsh Exhs. F & G (zero balance as of March 1, 2003)) (See Cadle v. Newhouse, 74 Fed. Appx. 152, 153 (2d Cir. 2003) and Hassett v. Goetzmann, 10 F.Supp.3d 181 (N.D.N.Y. 1998) (deposit in newly opened bank account, especially in time of financial

(Cf. <u>Cadle Company v. Avrohom Newhouse</u>, 74 Fed. Appx. 152 (2d Cir. 2003); <u>In re Marrama</u>, 445 F.2d 518 (1st Cir. 2006); <u>Hassett v. Goetzman</u>, 10 F. Supp.3d 181 (N.D.N.Y. 1998); <u>Dubrowsky v. Estate of Perlbinder</u>, 244 B.R. 560 (E.D.N.Y. 2000); <u>Harper v. F.S. & O Assoc., Inc.</u> 1992 U.S. Dist. LEXIS 21024 (S.D.N.Y. 1992))

Implicitly acknowledging the state of the law, Deutsche Bank Managing Director, David Bell, purports to trace the Natexis Bleichroeder funds in a fashion which suits his purposes, asserting: "The money transferred from the Natexis [Bleichroeder] accounts to Deutsche Bank on July 25, 2003 . . . was previously withdrawn from collateral accounts held at Deutsche Bank." (Bell Affidavit, paragraph 21) This statement, unsupported by any ledger or bank statement, is patently untrue. As already demonstrated, the money deposited with Natexis Bleichroeder was transferred in from CS Aviation's Operating Account at Citibank.

As a further line of defense, Bell states – in rather tentative language suggesting hearsay, and without any evidentiary support: "It is my understanding that this money [on deposit with Natexis Bleichroeder] was at all times subject to Deutsche Bank's security interest." (Bell Affidavit paragraph 20) This too is untrue. The cash subject to Deutsche Bank's security interest was defined and described by the Lease Cash Collateral Account Agreement which is annexed to Bell's Affidavit as Exhibit D. This document defines the money subject to the lenders' security interest as certain specified accounts (operating,

---

distress, as evidence of fraudulent transfer.)) At his deposition, former CS Aviation comptroller Carlos Arteaga, claimed that he had no recollection of how the nearly $4 million got into the Bleichroeder account, or who it belonged to. The lack of an explanation for a transfer is evidence of its fraudulent character. (<u>In re Marrama</u>, 445 F.3d 518 (1st Cir. 2006)) Another fact worthy of note is the longstanding relationship between Bleichroeder and George Soros. (Grayson Dec. Exh. 44) The Court's attention is further directed to <u>Orr v. Kinderhill Corp.</u>, 991 F.2d 31, 35-36 (2d Cir. 1993): "It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as a single transaction for analysis under the UFCA."

maintenance reserve, and security) ***identified to the individual mortgaged aircraft and to be maintained at Deutsche Bank.*** The Bleichroeder accounts did not meet this description. They were not identified to particular aircraft (see Arteaga Deposition Exhibit 12, p. 2, Grayson Dec. Exh. 1), and – at the risk of belaboring the obvious – they were not maintained at Deutsche Bank.[26] It follows that they were not security for Deutsche Bank's loan.[27]

### D. The Funds On Deposit in the Operating Accounts of S-C Domestic Holdings III, IV, XVIII, XIX, XV, XII, XVI, XIII, XIV and XVII, and S-C Aviation Holdings VII, VIII, IX and XI, Totaling $740,333.65, Were Property of CS Aviation and Fraudulently Transferred To Deutsche Bank on July 25, 2003

As James Walsh explains in his affidavit:

CS Aviation had management agreements with the Aircraft Owners for CS Aviation to Manage the Aircraft ("Management Agreements"). All of the management agreements had the same terms. . . On or about November 30, 2000, each of the management agreements was amended to provide that the Aircraft Owner would pay CS Aviation a management fee equal to the operating expenses CS Aviation incurred in discharging its management duties . . .[28]

(Walsh Affidavit paragraphs 29 and 30) Walsh goes on to attach to his Affidavit, as Exhibits C and D respectively, an exemplar of the original Management Agreement dated December 11, 1997, and the Amendment to that agreement, dated November 20, 2000. The Amendment contains a list of the bank accounts from which CS Aviation is to fund

---

[26] The Court is respectfully reminded of Carlos Arteaga's testimony that ordinarily, money within the debt facility was deposited with Deutsche Bank, and that he could think of no reason why the Natexis Bleichroeder accounts would fall within the debt facility. (Arteaga Deposition, Grayson Dec. Exh. 1, p. 135)

[27] The money on deposit at Bleichroeder was probably the "cash on hand" in "CS Operating Accounts" which James Walsh referenced at his deposition. The amount was approximately correct and the Akin Gump escrow account was indeed funded out of a Bleichroeder account. (See Funds Flow Chart, Grayson Dec. Exh. 33). Moreover, Walsh routinely used the Bleichroeder account to cover CS expenses, either directly or by funneling money back through the Citibank account. (Grayson Dec. Exh. 21) Indeed, the Bleichroeder account was used to pay Akin Gump a retainer of approximately $150,000. (Ibid.)

[28] Walsh here adds the words "with respect to that owner," but no such words or concept appear in the Amendment to the management agreement. What is more, in daily practice, CS Aviation withdrew fund to cover its operating expenses from whichever aircraft operating account contained cash. (Walsh II Deposition, Grayson Dec. Exh. 14, pp. 20-23; Arteaga Deposition, Grayson Dec. Exh. 1, p. 62)

its operating expenses, and these are the operating accounts of the entities set forth in the caption to this argument section. (See Walsh Affidavit Exh. D, Schedule 2)

The judgment which was entered in favor of Jet Star and against CS Aviation on July 25, 2006, was an operating expense of CS. As Nancy Dahl of the Wells Fargo Trust Department explained at her deposition, performance of each contract executed by her bank as owner-trustee, is the responsibility of the aircraft manager. (Dahl Deposition, Grayson Dec. Exh. 4, p. 76) When a contract goes awry, the aircraft manager is routinely sued, as in Jet Star I, the TACA Litigation, and the Tradewinds Litigation.[29] If a judgment is rendered against CS Aviation in such litigation, it is an operating expense for which CS is entitled to reimbursement.

On July 15, 2003, when judgment was rendered against CS Aviation in Jet Star I, the judgment became an operating expense of CS Aviation, and CS should have accessed funds from the accounts listed on Schedule II to its Amended Management Agreement to cover this expense. Instead, ten days later, when the judgment was about to go live, all of the funds in these accounts – totaling $740,333.65, were transferred to Deutsche Bank. (See Acceptance Agreement (Bell Affidavit Exh. G) Schedule C, and Arteaga Deposition Exh. 12, appended to Grayson Dec. as Exh. 1) Because all the monies in the accounts listed in Schedule II of the Management Agreement became the property of CS Aviation on July 15, 2003, and on July 25, 2003, they were transferred to Deutsche Bank – to which CS Aviation was not indebted – the transfer violated New York's fraudulent conveyance law.

---

[29] See Dorchak Deposition, Grayson Dec. Exh. 5, pp. 55-56.

<u>E. Expert Personnel, Intellectual Property, and Chattel of CS Aviation Were Conveyed to Windshear for the Benefit of Deutsche Bank</u>

As acknowledged by both the Allocation Agreement and the Confidential Information Memorandum prepared when C-S Aviation Services was offered for sale together with the fleet in 1999, the well-staffed company possessed expertise, with respect to both the aviation industry and the fleet, which had pecuniary value. (See Grayson Dec. Exh. 16, and Walsh Affidavit, Exh. 1) As Edward Christian observed at his deposition: "a company is made up of people." (Christian Deposition, Grayson Dec. Exh. 3, p. 118) Gary Kincaid similarly acknowledged that the best asset CS Aviation had was the expertise of its personnel. (Kincaid Deposition, Grayson Dec. Exh. 9, pp. 14 et seq.) He went on to wax eloquent about the expertise of these men, especially Technical Vice-President Nick Santangelo. (<u>Ibid.</u> and p. 139 et seq.)

The Lenders in this case conducted their own investigation of prospective aircraft managers and concluded that CS Aviation was the best available. As Michael Pruzan explained:

> [T]hey did a bake-off. They met with a couple of folks to manage the planes, and at the end of the day decided that Jim Walsh[30] and his team were going to be the ones who they wanted to manage the planes.

(Pruzan Deposition, Grayson Dec. Exh. 10, p. 73)

Having concluded that CS Aviation was the best aircraft manager, the Lenders set out to capture CS Aviation's expert personnel, institutional memory, and even its office

---

[30] The question of why the Lenders ultimately selected Gary Kincaid rather than James Walsh to lead the management company is interesting but not material to this motion for summary judgment. For what it is worth, Kincaid testified that GMAC contacted him, threw him into the ring, and put their weight behind him. But Deutsche Bank continued negotiating with Walsh for six weeks, and the dispositive factor was probably that Walsh wanted a set percentage of receipts in exchange for management whereas Kincaid was willing to accept a fixed fee. One can see where this difference might have been material in light of what transpired in the TACA litigation. (Kincaid Deposition, Grayson Dec. Exh. 9, pp. 36-43)

equipment,[31] effectively holding CS intact while repackaging the company in a new legal structure with a new name to shed liabilities. (See GMAC e-mail to Deutsche Bank, Grayson Exh. 22, quoted <u>supra</u>.) This maneuver was plainly conducted for Deutsche Bank's own benefit, and with the intention of hindering, delaying, and defrauding judgment creditor Jet Star. (As previously noted, the terms of Windshear's engagement prohibited it from doing business with anyone other than Deutsche Bank. (Grayson Dec. Exh. 32, paragraph 2(c))[32] Deutsche Bank, having gutted CS Aviation, and appropriated valuable assets of CS for its own benefit, is now required to compensate judgment creditor Jet Star. An appropriate measure of compensation would be the $1,170,000 which Deutsche Bank paid "Windshear" for aircraft management services.[33]

### F. Legal Interests Were Conveyed From CS Aviation To Deutsche Bank In Exchange For No Consideration Whatsoever

In addition to the foregoing more or less tangible things which were conveyed by CS Aviation to Deutsche Bank, CS Aviation also, by the terms of the Acceptance Agreement, conveyed away its right to any proceeds from the TACA Litigation, and any claims it might have against the aircraft owning entities. (See Acceptance Agreement Bell Exh. G) As explained, <u>infra</u>, in the section of this brief dealing with the TACA

---

[31] While defense counsel have chided plaintiff's counsel for making a federal case out of the fraudulent conveyance of staplers – or even staples – the May 12, 2003 e-mail from GMAC to Deutsche Bank evinces a healthy enthusiasm for seizing CS Aviation office equipment.

[32] There is much other evidence in the record supporting the proposition that Windshear was a continuation of CS, controlled by Deutsche Bank, and never an independent company. For example, Kincaid received a telephone call from GMAC asking him whether he was "interested in applying for the job managing the company." (Kincaid Deposition, Grayson Exh. 9, p. 44) When Deutsche Bank decided they didn't want Walsh, Michael Pruzan, at Deutsche Bank's behest, "terminated" Walsh. (Pruzan Deposition, Grayson Dec. Exh. 10, pp. 87 et seq.)

[33] See Kincaid Deposition, Grayson Dec. Exh. 9, pp. 85, 78 for calculation of receipts ($130,000 per month times nine months of operation). Plaintiff further notes that the sleight of hand with the two corporations benefited Soros as well as Deutsche Bank because throwing in the aircraft manager to sweeten the deal undoubtedly made it easier for Soros to reach agreement with the Lenders on more favorable terms, and provided Soros and Chatterjee with the means by which they relieved themselves of over $27,000 worth of unemployment insurance liability.

Litigation, these were conveyances of valuable rights, and the rights were conveyed in exchange for no consideration whatever, as CS was never indebted to Deutsche Bank.

G. Defendants Soros and Chatterjee are Liable for Fraudulently Transferring $594,337.93 to Akin, Gump's Trust Account for Their Own Benefit

As previously explained, $594,337.93 was transferred out of CS Aviation's Operating Account, via a Bleischroeder Account, and paid into Akin, Gump's trust account on the day that Jet Star's judgment "went live." The lion's share of this sum was paid to CS Aviation employees, and the rest went to pay SFM in its capacity as landlord (even though the arrangement was an informal sublet with no written lease),[34] pay part of the legal fees which George Soros owed to Akin Gump,[35] reimburse the first $10,000 of legal fees which Wells Fargo incurred in connection with the Jet Star Litigation and demanded from Soros,[36] etc. CS Aviation was not contractually liable for any one of these payments, and yet Soros benefited because the payments were made. The payments to employees in particular benefited[37] Soros, Chatterjee, and SFM, because they received release and confidentiality agreements from the employees in exchange for the payments. (Kincaid Deposition, Grayson Dec. Exh. 9, p. 57) What is more, the transfer into escrow on the day that Jet Star's judgment went live leaves no doubt that Soros's prime motivation was to hinder, delay and defraud Jet Star.

---

[34] See Walsh II Deposition, Grayson Dec. Exh. 14, p. 17.

[35] Even though the client in the foreclosure matter was supposed to be George Soros (Christian Deposition, Grayson Dec. Exh. 3, p. 14), at the last minute Ronald Goldberg instructed his billing personnel to prepare a $25,000 invoice for CS Aviation so that part of the cost could be shifted off Soros and onto CS. (See Grayson Dec. Exh. 29)

[36] Nancy Dahl maintains that Wells Fargo is "entitled to indemnity from George Soros," for the rest of the Bank's legal fees because it was "the Soros organization behind the special purpose corporations." (Dahl Deposition, Grayson Dec. Exh. 4, p. 117)

[37] Defendants Soros and Chatterjee concede that a fraudulent conveyance plaintiff is entitled to judgment not only against a transferee but also against any person who benefits from the transfer. See Soros/Chatterjee Memorandum of Law in Support of Motion for Summary Judgment at 6 and cases cited therein. See also RTC Mortgage Trust 995- N1 v. Sopher, 171 F.Supp.3d 192 (S.D.N.Y. 2001).

**Punitive Damages May Be Awarded In Cases of Intentional Fraudulent Transfer, And Are Justified Here By Defendants' Gross and Wanton Conduct**

Defendants Soros and Chatterjee further urge that "The Court Must Grant Summary Judgment Dismissing The Punitive Damage Claims." (Chatterjee/Soros Memorandum at 8) The cases cited by Soros and Chatterjee do not support their position, and this Court need do nothing of the sort.

The case of <u>111 East 88th Partners v. Simon</u>, 106 Misc.2d 693, 697-697 (1980), provides an overview of New York's law of punitive damages:

> To understand the application of punitive damages, we must look to their origin. The law of punitive damages can be traced to the Code of Hammurabi (Law 8) and the Bible (Exodus, 121, 37). The principal case to which the law of punitive damages can be traced is <u>Huckle v. Money</u> (2 Wils 205, 95 Eng. Rep. 768 [KB 1763]. In that case, an award of "exemplary damages" was made, although the injury was minor, because of the defendant's outrageous behavior. It has long been the law of this state that punitive damages may be awarded not only to recompense the person injured, but also to punish a wrongdoer. (<u>Taylor v. Church</u>, 8 N.Y. 452; <u>Millard v. Brown</u>, 35 N.Y. 297; <u>Hamilton v. Third Ave. R.R. Co.</u>, 53 N.Y. 25) They are also intended to solace the plaintiff for mental anguish, laceration of his feelings, shame, degradation, or other aggravations of the original wrong. (<u>Goines v. Pennsylvania R.R.Co.</u>, 208 Misc. 103) And they are an inducement to the plaintiff to take action against the wrongdoer, thereby providing a service to the public by preventing further harm to others. (<u>Walker v. Sheldon</u>, 10 N.Y.2d 401) It is not the form of the action which gives the court the right to award punitive damages, but rather the moral culpability of the defendant. (<u>Hamilton v. Third Ave. R.R. Co.</u>, <u>supra</u>.)
>
> In awarding punitive damages, the court must base the size of the award on the financial condition of the wrongdoer, rather than just the damages suffered by the victim. Because punitive damages are based on the moral culpability of the offending party, and intended to discourage future wrong-doing, they must be sufficiently large to have a punitive impact on the wrongdoer. An award based only on the victim's financial position or the damages suffered, might constitute a mere slap on the wrist of the wrongdoer and would not accomplish the public purpose of discouraging repetition of the wrong.

Punitive damages in an intentional fraudulent transfer case are appropriate where a defendants' conduct was "gross and wanton and involved high moral culpability." (Blakeslee v. Rabinor, 182 A.D.2d 390, 392 (1992), citing Borkowski v. Borkowski, 39 N.Y.2d 982 (1976)) In Keen v. Keen, 124 A.D.2d 938 (1986), the appellate court upheld punitive damage awards of $100,000 against each of several parties who conspired with a former husband to execute a series of fraudulent transfers which deprived the former wife of the benefit of her marital settlement. Chase Manhattan Bank v. Perla and Perla, 65 A.D.2d 207 (1978), holds that where a husband and wife conspired to place property beyond the reach of plaintiff bank, and the husband used his status as an attorney to mislead the bank and enrich himself, the question of whether punitive damages should be awarded against both husband and wife was properly one for the jury. In so holding, the Chase Manhattan Court emphasized that the wife could be held liable in punitive damages for the acts which the husband committed as her agent within the scope of his authority. (Citing Fairchild v. McMahon, 139 N.Y. 290 (1893)) She could be also be held liable in punitive damages if her husband acted outside of his authority, but she subsequently ratified his acts and retained the benefits from them. (Citing Elwell v. Chamberlin, 31 N.Y. 611, 619 (1864); Bailey v. Diamond, Int. Corp. 47 A.D. 2d 363, 367 (1975))

The defendants in this case have behaved in a "gross and wanton" manner. Soros and Chatterjee deliberately abused the corporate form by constructing a labyrinth of interrelated companies which they used to upstream money, while leaving the visible portions of the corporate structure without assets. When Soros decided to exit the business, he deliberately defaulted in the Jet Star case, arrogantly believing that if he

made CS Aviation disappear, the chain of corporate command would never be traced to him. Soros's attorneys at Akin, Gump -- Goldberg and Christian -- similarly evinced contempt for legal process through their brazen and shameless remarks.

Pruzan, Goldberg and Christian were all agents of Soros and Chatterjee, and there is nothing in the record to suggest that they acted outside the scope of their authority. Moreover, now that Soros and Chatterjee know fully what was done in their names, they have chosen to retain the fruits of the wrongdoing and ratified the acts of their agents, by vigorously defending this lawsuit rather than refunding Jet Star's money in compliance with Judge Batts' order.

Defendant Deutsche Bank, and the syndicate of lenders Deutsche Bank represents, have also behaved in a gross and wanton manner. Deutsche Bank deliberately defrauded Jet Star by appropriating the assets of CS Aviation, a corporation which was indebted to Jet Star but not to Deutsche Bank. Deutsche Bank is responsible for the transparent charade in which CS Aviation was renamed "Windshear" so that it could go forward, minus its liability to Jet Star, and provide expert service to Deutsche Bank. When Deutsche Bank was caught red-handed, it did not disgorge its ill-gotten gains. Instead, Deutsche Bank's counsel tried to intimidate Jet Star's counsel with frequent reference to Rule 11. Now, Deutsche Bank Managing Director Bell misinforms the Court regarding the origin of the funds in the Bleichroeder Accounts, stating that they were withdrawn from Deutsche Bank, although all bank statements and ledgers reflect that the funds were withdrawn from Citibank. The entire course of conduct bespeaks a greed and contempt for the legal system which is gross, wanton, and ought to be punished.

It further bears emphasis that Soros, Chatterjee, and Deutsche Bank all continue to conduct business on a global scale. If their damages in this action are limited to restitution of the fraudulently conveyed assets, they will be encouraged to engage in further frauds, gambling that, much of the time, they will escape detection. Punitive damages are therefore required to deter them from future misconduct.

III.

Plaintiff's Fourth and Fifth Causes of Action Have Merit

Defendant Deutsche Bank contends that plaintiff's Fourth and Fifth Causes of action, both of which assert fraudulent conveyance claims in connection with the TACA Litigation,[38] should be dismissed because: 1) CS Aviation was not the beneficiary of the trusts under which the aircraft at issue in the TACA case were held, 2) even if CS Aviation *were* the beneficiary of the trusts, the aircraft rents collected in the TACA case belonged to Deutsche Bank because the rents were collateral for Deutsche Bank's loan under the chattel mortgages recorded with the FAA, and 3) CS Aviation had no legal interest in the aircraft rents collected in the TACA case.

Having carefully reviewed the evidence and authority submitted by Deutsche Bank, plaintiff is persuaded that the aircraft rents collected in the TACA case *were* collateral for Deutsche Bank's loan under the chattel mortgages, and that the identity of the trust beneficiary is therefore a moot question. Nonetheless, CS Aviation *did* have a legal interest in the TACA litigation proceeds which was fraudulently conveyed by the Acceptance Agreement Litigation Clause. (See Acceptance Agreement, paragraph I.5,

---

[38] The Fourth Cause of Action asserts an intentional fraudulent transfer claim while the Fifth Cause of Action asserts a constructive fraudulent transfer claim.

Exh. G to Bell Declaration) This legal interest was the right to collect a management fee out of the TACA proceeds.

CS Aviation personnel worked very hard on the TACA case. James Walsh testified that he was in on-going communication with the lawyers suing TACA throughout his tenure at CS Aviation. (Walsh II Deposition, Grayson Dec. Exh. 14, p. 42) Even after the CS Aviation personnel "moved" to "Windshear," the contract between Windshear and Deutsche Bank required the personnel to continue working on the TACA litigation. (See Grayson Dec. Exh. 32, paragraph 1 (g))[39] CS Aviation personnel also contributed value by managing, caring for, and remarketing the aircraft at issue in the TACA case, which were returned by TACA long before CS Aviation closed its doors.

One may posit several theories as to why CS Aviation was entitled to a portion of the proceeds from the TACA case. On the one hand, as previously discussed, CS Aviation was entitled to reimbursement of the expense it incurred when judgment was entered in favor of Jet Star on July 15, 2003. To the extent that the funds on deposit in the aircraft operating accounts on that date were insufficient to fully reimburse CS, the obligation should have carried forward and been satisfied when the aircraft rents were collected at the close of the TACA case. When the obligation was purportedly extinguished (in exchange for no consideration) by paragraph I.5 of the Acceptance Agreement, in which CS ceded to Deutsche Bank its interest in the TACA Litigation, a fraudulent transfer occurred.

Another way to look at the problem is that, regardless of whether CS Aviation was entitled to reimbursement of the Jet Star judgment as an operating expense under the

_____

[39] This Court is respectfully requested to take judicial notice of the entire Court file in the TACA case (S.D.N.Y. Case no. 01 Civ. 11484 (GEL)), which is bursting with declarations and calculations of CS Aviation personnel.

Amended Management Agreement, it was still entitled, on a *quantum meruit* basis, to compensation for the services it supplied which made the TACA judgment possible. To the extent that paragraph I.5 of the Acceptance Agreement purported to cut off the right to such a *quantum meruit* recovery, it was a voidable fraudulent transfer. Plaintiff further suggests that a reasonable measure for *quantum meruit* recovery would be the five percent of gross receipts provided for by the Management Agreements prior to their November, 2000 amendment. Five percent of $23 million equals $1,150,000.

Plaintiff further takes this opportunity to observe that, to the extent that CS Aviation provided a service which made the TACA judgment possible, the right of CS Aviation to be compensated is not extinguished by the chattel mortgages, any more than the chattel mortgages extinguished Sidley's right to be compensated for the work *it* performed to obtain the judgment.


IV.

<u>Plaintiff's Sixth Cause of Action For Unjust Enrichment Has Merit</u>

Plaintiff's Sixth Cause of Action contends that, pursuant to paragraph I.5 of the Acceptance Agreement, Deutsche Bank stepped into the shoes of CS Aviation in both Jet Star I and the TACA litigation, assuming liabilities as well as assets, and that in equity and fairness, Deutsche Bank should have paid the Jet Star I judgment out of the proceeds of the TACA Litigation.

Deutsche Bank first asserts a technical objection to the unjust enrichment claim, urging that the claim is barred due to the lack of relationship between Jet Star and Deutsche Bank. The answer to this argument is that Deutsche Bank affirmatively placed

itself in privity with Jet Star when it stepped into the shoes of CS Aviation pursuant to Acceptance Agreement paragraph I.5.[40]

Next, Deutsche Bank lamely asserts that it could not have acquired any liability for a judgment rendered in favor of plaintiff in Jet Star I, pursuant to paragraph I.5 of the Acceptance Agreement, because all the attorneys involved in the transaction agreed that they intended to transfer the litigation assets to Deutsche Bank without transferring the litigations liabilities. This may well have been what they desired. People want to have their cake and eat it all the time. The world is full of people who want to gorge themselves on hot fudge sundaes without gaining weight, earn income without incurring income tax, and enjoy life decade after decade without aging a day. But that's not the way it happens in real life.

Deutsche Bank's analysis of the language of the Acceptance Agreement itself suffers from exactly the same wishful thinking. Deutsche Bank quotes language stating that "neither the Administrative Agent [Deutsche Bank], the Lenders, the Trustee, nor any of their respective officers, directors, employees, agents, advisors, partners, members and shareholders ***shall have any duties whatsoever to the Obligors, C-S, and their affiliates . . . with respect to the Litigation***." (Deutsche Bank Memorandum at 21. Emphasis in original.) Jet Star, however, is not an "Obligor, C-S [or a CS] affiliate." It is not even a party to the Acceptance Agreement, so it cannot be bound by it.

In truth, Deutsche Bank never believed it could consummate a transaction whereby it took control of all the Soros/Chatterjee aircraft assets and dismembered CS

---

[40] Indeed, "stepped into the shoes" is exactly the phrase which Bingham lawyer Joshua Dorchak used to describe what his client was going to do, when he asked plaintiff's counsel to refrain from moving for a default judgment. It was also the phrase employed when Dorchak's supervisor, Robert Dombroff, and Ronald Goldberg telephoned plaintiff's counsel after the default judgment was entered. (Grayson Dec. paragraph 9)

Aviation, without also assuming responsibility for any judgment against CS Aviation and in favor of Jet Star. As Edward Christian explained to James Walsh in their e-mail correspondence of July 24, 2003: "All parties know C-S is a defendant in Jet Star, but it is still part of the settlement *as the banks believe their funds are atrisk [sic] if the judgment is entered against C-S in that case*." (Grayson Dec. Exh. 30)

In short, Deutsche Bank seized control of the Jet Star I Litigation and stepped into the shoes of CS Aviation, both because it hoped to profit from the counterclaim against Jet Star and because it feared being held liable if the case went in Jet Star's favor. As Joshua Dorchak, the Deutsche Bank lawyer with primary responsibility for this aspect of the transaction, testified:

> Q. Mr. Dorchak, when you called me, was it your intention that if I agreed to not move for a default, you were going to – "you" being Bingham – was going to make an appearance for the defendants and litigate the case on the merits?
>
> A. Bingham was contemplating being substituted in as counsel for the defendants, and, you know, as counsel for those defendants, pursuing the case on the merits. That was a possibility.
>
> Q. And was it your intention to substitute in or you were contemplating substituting in on the cross-complaint as well . . .
>
> A. Again, the counter-claim I would call it.
>
> Q. The counterclaim, yes.
>
> A. Yes. As far as I can remember, the intention was to substitute in with respect to all issues that were open in the litigation.

(Dorchak Deposition, Grayson Exh. 5, pp. 144-145)

Dorchak further explained that even after the default was entered, Bingham still contemplated substituting in and attempting to have the default vacated. (Dorchak Deposition, pp. 180-181)

Toward the end of Dorchak's deposition, the following exchange transpired:

Q. [W]hen you telephoned me, was the result you intended that Deutsche Bank should have the power to take over the litigation and pursue the cross-complaint against my client and refuse to pay out a penny if we prevailed?

A. No.

(Dorchak Deposition at 218-219)

As Mr. Dorchak instinctively recognized, it would be inequitable for Deutsche Bank to assume the power to take over the Jet Star Litigation and pursue the cross-complaint – as it plainly did under Paragraph I.5 of the Acceptance Agreement – without also assuming the liability. It is doubly inequitable for Deutsche Bank to retain the $23 million it recovered from TACA Airlines pursuant to Paragraph I.5 assigning the "Litigation," without paying the default judgment in favor of Jet Star covered by the same contract paragraph.

Under New York law, a claim for unjust enrichment will succeed whenever, (1) defendant was enriched, (2) enrichment was at the plaintiff's expense, and (3) a defendant's retention of the benefit would be unjust. (In re Flutie, 310 B.R. 31, 58-59 (S.D.N.Y. 2004)) In this case, Deutsche Bank was unjustly enriched at Jet Star's expense when it retained litigation receipts pursuant to Acceptance Agreement paragraph I.5, but failed to pay Jet Star's judgment against TACA for which it was liable under the same contract paragraph. Deutsche Bank cites not one case to the contrary.

V.

<u>This Court Should Not Grant Summary Judgment on Plaintiff's Cause of Action to Pierce the Corporate Veil</u>

<u>A. Applicable Law</u>

Defendants cite <u>Fletcher v. Atex</u>, 68 F. 3d 1451 (2d Cir. 1995), for the proposition that Delaware law applies to plaintiff's piercing claim because CS Aviation is incorporated in Delaware. <u>Fletcher</u> so holds. On the other hand, another Second Circuit case, <u>Passalacqua Builders et al. v. Resnick Developers South et al.</u>, 933 F.2d 131 (2d Cir. 1991), holds that the law of the forum applies to claims to pierce the veil of a Delaware corporation. The question is not critical because the law of Delaware and the law of New York do not differ materially. In deference to defendants' stated preference, plaintiff will rely primarily upon Delaware law, but will, from time to time, reference a New York case or a national survey law review article.

The Soros/Chatterjee Memorandum of Law conveys the false impression that a plaintiff seeking to pierce the veil of a Delaware corporation must satisfy a complex jumble of requirements. Nothing could be further from the truth. As a Delaware Bankruptcy Court recently explained:

> Under Delaware law, courts can pierce the veil of a corporation where there is fraud ***or*** where [the corporation] is in fact a mere instrumentality or alter ego of its owner." <u>Fletcher v. Atex</u>, 68 F.3d 1451, 1456 (2d Cir. 1995) There is no requirement of fraud; to prove an alter ego claim, a plaintiff can satisfy a two-prong test: "(1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an overall element of injustice or unfairness . . . [is] present." <u>Id.</u> Factors establishing that the entities acted as a single economic unit include "whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder." <u>United States v. Golden Acres, Inc.</u>,

42

702 F.Supp. 1097, 1004 (D. Del. 1988), *aff'd*, 879 F.2d 860 (3d Cir. 1989)

(In re Ticketplane.com, 313 B.R. 24, 52-43)

Moreover, fraud and alter ego liability are not the only grounds available for piercing the corporate veil under Delaware law. Any equitable ground will suffice. (See Mabon, Nugent & Co. et al. v. Texas American Energy Corp. et al., 1988 Del Ch. LEXIS 11; Fed. Sec. L. Rep. (CCH) P93, 674, listing cognizable equitable grounds for piercing veil, and actually piercing veil on grounds of equitable estoppel). (Accord, David v. Mast, 1999 Del. Ch. LEXIS 34: "In the interests of justice, in an 'appropriate case,' a party wronged by actions taken by an owner shielded by the veil of a corporate shell may exercise its equitable right to pierce that screen and 'skewer' the corporate owner." Citing Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983 (1987)) It bears emphasis that a corporate veil may be pierced to shift responsibility to a party who is not a shareholder. (Nash v. Schock, 1998 Del.Ch. LEXIS 139) A corporate veil may also be pierced although the corporation has "filed separate tax returns, kept separate books and did not commingle personal funds," if this is necessary to "enforce . . . policies against the real wrongdoer hiding behind a corporate shell." (David v. Mast, supra)  (See also Morris v. Lawrence Mergenthaler et al., 1980 Del. Ch. LEXIS 546 (veil-piercing appropriate where controlling shareholder allows entry of default judgments against corporation, and transfers business to new corporation.))[41]

---

[41]  For two cases closely on point, applying New York law, see In re Rave Communications, 138 B.R. 390, 393  (S.D.N.Y. 1992) (veil pierced and individuals held liable where "Debtor, essentially a captive company, was stripped and rendered inoperable by its corporate parents and affiliates . . . and by the individuals who controlled those corporate entities . . . leaving its liabilities in its corporate shell.") See also Rebh v. Rotterdam Ventures, Inc., 685 N.Y.S.2d 234, 236 (A.D. 3d Dept. 1998) (veil of undercapitalized subsidiary pierced where defendant engaged in a scheme to "denude subsidiary of its assets in order to render it unable to honor its obligations" and new company carried on in the defunct subsidiary's shoes.)

<u>B. Application of Law to Facts</u>

In considering whether to grant summary judgment on a veil-piercing claim, a District Court must bear in mind "the infinite variety of situations that might warrant disregarding the corporate form." "The jury must decide whether – considering the totality of the evidence . . . the policy behind the presumption of corporate independence…is outweighed by the policy justifying disregarding the corporate form…" (<u>Passalacqua Builders et al. v. Resnick Developers South et al.</u>, 933 F.2d 131, 139 (2d Cir. 1991)) In this case, there is plenty of evidence for the jury to weigh.

The fraudulent transfer scenario set forth above is, in and of itself, sufficient reason to pierce the corporate veil of CS Aviation for fraud or inequity. (The Court is reminded that under Delaware Law, a corporate veil may be pierced ***either*** for fraud ***or*** under an alter ego theory.) The reasons why a jury might choose to pierce the corporate veil of CS Aviation under an alter ego theory are discussed below.

As explained in the preceding Statement of Facts, in late 1998, George Soros personally assumed complete control of CS Aviation, together with the rest of the aircraft companies, and delegated day-to-day control to SFM's Frank Sica and Sica's subordinates. From that day forward, Pernendu Chatterjee was the sole shareholder and director on corporate records, while Soros was half owner and sole director in reality.[42] [43] This, in and of itself, was a gross departure from legal corporate governance.

Adding insult to injury, Soros treated CS Aviation and the rest of the aircraft-related companies as one big bouillabaisse. Michael Pruzan, to whom Soros delegated

---

[42] See Walsh II Deposition, Grayson Dec. Exh. 14, pp. 7-8, and Grayson Dec. Exh. 16 (Soros has unrecorded one half ownership interest).

[43] For a short time, Colin Raymond represented SFM on CS Aviation's Board of Directors, but for the most part, SFM had no formal representation on CS Aviation's Board, and indeed, CS Aviation had no functioning Board of Directors.

day-to-day management responsibility for the aircraft beginning in 2002, was blissfully oblivious to any distinctions between the various companies, and even to the existence of a distinct entity known as CS Aviation Services, Inc. Pruzan knew that James Walsh reported to him, but had no idea who employed Walsh. (Pruzan Deposition, Grayson Dec. Exh. 10, pp. 18, 29) Asked whether he had ever heard of CS Aviation as a distinct corporation prior to his deposition, Pruzan replied: "There were a lot of SC, CS, alot [sic] of different companies that I heard of." (Pruzan Deposition, p. 18) Pruzan did not know whether CS Aviation had a Board of Directors. (Pruzan Deposition, p. 25) He had no idea whether Chatterjee was a shareholder or director of CS, and did not consult him in connection with the windup of the aircraft business. (Pruzan Deposition, pp. 93-94) As previously explained, Soros's contemptuous disregard for CS Aviation as a distinct legal entity reached its apotheosis when lawyers employed by Soros bartered away all of CS Aviation's assets to satisfy indebtedness of Soros's other aircraft companies.[44] The lawyers at Akin, Gump, compensated by Soros, claimed to represent CS Aviation, but could not have had that corporation's best interests in mind when they fashioned a transaction which stripped CS of its officers, employees and assets, leaving behind an empty shell.

The practice of treating the entire aircraft business as one big bouillabaisse extended to financial matters. Whenever CS Aviation needed money, it opportunistically took the money from whatever company's account had cash. (Walsh II Deposition, Grayson Dec. Exh. 14, pp. 20-23; Arteaga Deposition, Grayson Dec. Exh. 1, p. 62) The free ebb and flow of funds extended to ultimate beneficial owners Soros and Chatterjee as

---

[44] See Geyer v. Ingersoll Publications, 621 A.2d 784 (D.Ch. 1992) (corporate veil pierced where principal barters away corporate assets in exchange for personal gain.)

well. As James Walsh explained at his deposition, funds received, such as plaintiff Jet Star's deposit, were rapidly upstreamed to the ultimate beneficial owners on an "opportunistic" basis. (Walsh II Deposition, Grayson Dec. Exh. 14, p. 25) According to Walsh, if CS had prevailed on its counterclaim in Jet Star I, the receipts would have been upstreamed to Chatterjee and Soros. (Walsh I Deposition, Grayson Dec. Exh. 13, p. 123) Conversely, if funds – even the same funds – were needed again, the money could flow back downstream. Walsh's explanation, as related to the Jet Star I case, is enlightening:

> Q. So [if] in the ordinary course of business we had gotten a judgment against you, you would have gone to whichever account was the account of the nine planes [allocated to Jet Star's contract] and paid out of that account?
>
> A. That would have been number 1. Number 2, if there was a judgment and there was not enough money in that account, we would have looked to our other accounts that held the other aircraft . . . and used that funding and had, you know, receivables and payables between the different companies to cover that. And then to the extent that wouldn't have been sufficient, we would have gone back to Quantum, George Soros, and the Chatterjee Group and asked for an equity contribution to cover.

(Walsh II Deposition, Grayson Dec. Exh. 14, pp. 81-82)

The foregoing state of affairs belies not only defendants' assertion that the various legal entities were financially independent of each other, and of Soros and Chatterjee, but also defendants' present conclusory assertion that CS Aviation was adequately capitalized. Defendants Soros and Chatterjee stonewalled plaintiff's interrogatories directed to the question of CS Aviation's capitalization.[45] But it is nonetheless abundantly clear that capitalization was inadequate because CS was routinely sued for large amounts of money in its capacity as aircraft manager (i.e. Jet Star I, TACA Litigation, Tradewinds Litigation). Either CS was inadequately capitalized to answer for these foreseeable substantial obligations, or it was better capitalized than defendants admit and fraudulently

---

[45] See Grayson Exhs. 42 and 43. A motion to compel or strike is now pending.

conveyed its assets. Defendants cannot prevail on both the fraudulent conveyance claim and the piercing claim. They are between Scylla and Charybdis where they belong.

Moreover, contrary to James Walsh's current protestations that CS Aviation always had a Board of Directors which held meetings Walsh attended,[46] the great weight of evidence demonstrates that CS Aviation has not had a functioning Board of Directors for a very long time, and has not had any directors at all since July 25, 2003. Up until sometime in 1999, CS Aviation had a blue chip Board, graced by such leading lights of the aviation industry as Jeffery Erickson, former CEO of TWA. (Kincaid Deposition, Grayson Dec. Exh. 9, p. 178)[47]  As former CS Marketing Vice-President Gary Kincaid testified at his deposition, this Board was disbanded to the great detriment of CS shortly after Soros took control. (Ibid.) James Walsh, at his deposition, likewise testified that CS lacked a Board of Directors after this group disbanded:

> Q. At any time while you were employed by CS Aviation, did they have a board of directors?
>
> A. We did in the early tenure. I can't remember when we disbanded or stopped doing – at least the first year I was there, and then we did not operate through a board of directors at that time.
>
> Q. You disbanded the Board?
>
> A. Yes.

(Walsh II Deposition, p. 6)[48]

Pernendu Chatterjee, who was supposedly a member of the CS Aviation Board of Directors from its inception, has been remarkably evasive on this topic. At his deposition,

---

[46]  See Walsh Affidavit paragraphs 11, 14, and 15.
[47]  It is a bit unclear whether this was a Board of Directors, an advisor Board, or both. The Confidential Information Memorandum annexed to the Walsh Affidavit as Exhibit A, page 33, shows the President of CS Aviation reporting to this Board of Advisors.
[48]  See also Southwood-Smith Deposition, Grayson Dec. Exh. 11, p. 54 (no active board)

he was asked: "Do you have any recollection of a Board of Directors' meeting?" He responded: "Whatever records there are, you can construe some of the other meetings we had to be de facto Board of Directors meetings." (Chatterjee Deposition, Grayson Dec. Exh. 2, p. 213) And "records" there certainly weren't. During discovery in this action, plaintiff's counsel combed conference room after conference room packed with documents, searching for the Board of Directors' meeting minutes she demanded in discovery, but she found none.[49] (Grayson Dec. paragraph 11) This is not too surprising, as James Walsh testified that CS Aviation had no Secretary,[50] to his recollection, and he never saw any minutes of a Board of Directors' meeting. (Walsh II Deposition, pp. 10-11) Moreover, Dr. Chatterjee's answer to plaintiff's interrogatory calling for the dates and attendees of CS Aviation Board of Directors meetings was so non-responsive that Magistrate Judge Freeman ordered him to serve a supplemental response. As of July 18, 2006, no supplemental response has been served. (See Grayson Dec. Exhs. 35 and 36)[51][52]

James Walsh's present assertion that, as President of CS Aviation, he "reported to Dr. Chatterjee as a director of CS" (Walsh Affidavit paragraph 7) is textbook corporate governance, but contradicted by Walsh's deposition testimony. At his deposition, Walsh testified that he reported to Soros employee, Michael Pruzan. (Walsh II Deposition, pp.

---

[49] *There were not even minutes authorizing the transaction of July 25, 2003, which terminated the corporation's existence as a viable entity.*

[50] CS Aviation's By-laws (Grayson Dec. Exh. 16) required a Secretary, a Treasurer and a President. (See By-laws, Article IV, section 1) CS was for many years without a Secretary and Treasurer (Grayson Dec. paragraph 11), and since July 25, 2003 has been without a President.

[51] It is also uncontested that as CS Aviation was stripped of its directors, officers, and employees in the July 25, 2003 closing, the corporation now has no directors at all – not even Dr. Chatterjee. This violates the CS Aviation By-laws (Grayson Dec. Exh. 16) which require at least one director. (See By-laws, Article III)

[52] Plaintiff notes a further By-laws violation relating to Article II (Meetings of Stockholders). Although the By-laws require that such meetings be held annually, defendants' document production contains no minutes of annual meetings or sole shareholders' resolutions in lieu of such meetings. (Grayson Dec. paragraph 11)

32-33) For his part, Dr. Chatterjee stated emphatically: "C-S Management is directed by Soros." (Chatterjee Deposition, Grayson Dec. Exh. 2, p. 115)[53]

James Walsh also now swears that CS Aviation had its own office space in 2003, which was subleased from SFM, but also separate from SFM office space. (Walsh Affidavit paragraph 26) This statement is contradicted by the testimony of Carlos Arteaga and Gary Kincaid, who testified that the desks of the CS employees were interspersed among desks occupied by employees of other Soros companies, and that CS Aviation lacked its own entrance. (Arteaga Deposition, Grayson Dec. Exh. 1, pp. 142-146; Kincaid Deposition, Grayson Dec. Exh. 9, pp. 19-20)[54] CS also used the Soros computer system, Soros mailroom, and Soros telephone exchange. (Southwood-Smith Deposition, Grayson Dec. Exh. 11, pp. 65-69; Kincaid Deposition, Grayson Dec. Exh. 9, pp. 70-73) As Diane Southwood-Smith described the arrangement, CS was "just another piece of the pie." (Southwood-Smith Deposition, p. 65). Moreover, James Walsh further testified that there was no written recordation of CS Aviation's so-called sublease of SFM office space. (Walsh II Deposition, Grayson Dec. Exh. 14, pp. 17, 115-116)[55]

As a final argument intended to demonstrate that CS Aviation honored the corporate form, defendants urge that CS maintained books and records. Yet according to the interrogatory responses of both Soros and Chatterjee, these records are not sufficient

---

[53] Dr. Chatterjee, while asserting that Soros controlled CS Aviation beginning in early 1999, also acknowledged that his responsibilities as a sole shareholder and corporate director survived the change in control. (Chatterjee Deposition, pp. 72-74, 82 et seq.) Insofar as Chatterjee permitted gross disregard of corporate proprieties, and CS Aviation was ultimately liquidated in the course of a fraudulent conveyance, Chatterjee should be held liable for the corporation's debts along with Soros.

[54] See Passalacqua Builders et al. v. Resnick Developer South et al. 933 F. 2d 131, 140 (2d Cir. 1993), citing Barber, Piercing the Corporate Veil, 17 Willamette L. Rev. 371, 391 (1981) (shared office space one ground for piercing corporate veil.)

[55] At an earlier date when CS Aviation really did have its own office space, SFM guaranteed the lease payments. (See Grayson Dec. Exh. 17) (See Passalacqua Builders, supra, citing Willamette Law Review Article (guarantee basis for piercing veil.))

to enable them to trace plaintiff's deposit which Judge Batts ordered refunded. (See Grayson Dec. Exhs. 42 and 43) Plaintiff's money is now supposedly lost in space.

In closing, it bears emphasis that the irregularities in corporate governance here at issue were not minor technical breaches, but rather part of a systematic abuse of the corporate form. Defendants erected a complex corporate structure with layer upon layer of holding companies, and CS Aviation the only visible part of the iceberg, to prevent any creditor from identifying and suing the ultimate beneficial owners.[56] Certainly no other legitimate explanation for the corporate structure has been articulated. Now, defendants Soros and Chatterjee, having first neglected the elaborate corporate structure erected for their protection, and then actively exploited the structure to effect a fraudulent conveyance, seek to shield their assets behind the corporate form. They are not deserving of such legal protection. Plaintiff's piercing claim should be submitted to the jury.

Conclusion

For all of the reasons set forth above, defendants' motions for summary judgment should be denied.

Respectfully submitted,

Ss// V. Elizabeth Grayson (VEG2792)
Counsel for Plaintiff, Jet Star

---

[56] Aircraft sale or lease contracts named only the owner-trustee Wells Fargo (which held no assets) and CS Aviation. Funds were wired to S-C Aircraft Holding, and intermediate level holding company which directly owned nothing, and S-C Aircraft Holding channeled the funds on the ultimate beneficiaries. (See Dahl Deposition, Grayson Dec. Exh. 4, p. 44 and Dahl Affidavit Exh. G)