Raymond Fitzgerald, Esq. (RF 9526)
David J. McCarthy, Esq. (DM 7910)
BUTLER, FITZGERALD, FIVESON & McCARTHY
A Professional Corporation
Attorneys for Defendant
    George Soros
350 Fifth Avenue, Suite 6215
New York, NY 10118
(212) 615-2200

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JET STAR ENTERPRISES LTD.,

                              Plaintiff,

                    v.                                  05 Civ. 6585 (HB)

GEORGE SOROS, PERNENDU CHATTERJEE,
DEUTSCHE BANK TRUST AMERICAS,
MORGAN STANLEY CS AVIATION
HOLDINGS LLC, WELLS FARGO BANK
NORTHWEST, N.A., AKIN GUMP STRAUSS
HAUER & FELD LLP, BINGHAM McCUTCHEON
LLP, SIDLEY AUSTIN BROWN & WOOD LLP,
and MB STATUTORY TRUST,

                              Defendants.
-----------------------------------------------------------------X

                    DECLARATION OF DANIEL EULE

        Daniel Eule hereby declares as follows:

        1.      I have been employed by Soros Fund Management LLC, a Delaware
limited liability company ("SFM LLC"), since in or about 1997, as its Tax Director until
about a year or so ago. Before being employed by SFM LLC, I was employed by Soros
Fund Management, a sole proprietorship of defendant George Soros ("SFM
Proprietorship"), as its Tax Director. I make this declaration in support of Mr. Soros's
motion for summary judgment. I am fully familiar with the facts set forth below from my
personal knowledge and/or from my review of relevant documents.

        2.      Prior to January 1, 1997, SFM Proprietorship was engaged in the business
of advising investment funds, including Quantum Industrial Partners LDC ("Quantum")

                                        1

which had an investment in an aircraft leasing business often referred to as "C-S Aviation".

3.      Effective January 1, 1997 SFM Proprietorship transferred its investment advisory business to SFM LLC. As of that date, SFM LLC became the investment advisor of Quantum. Attached as Exhibit A is a copy of the Certificate of Formation of SFM LLC, showing that SFM LLC was formed on October 31, 1996. Attached as Exhibit B is a copy of the Master Contribution, Assignment and Assumption agreement, dated as of January 1, 1997, executed by Mr. Soros in his capacity as an individual, as the sole proprietor of SFM Proprietorship and as the manager of SFM LLC, pursuant to which the investment advisory business was transferred. At all times since at least January 1, 1997 Mr. Soros has been the sole manager of SFM LLC.

4.      Attached as Exhibit C is a copy of an Allocation Agreement made as of an unspecified date in February 1999. In that agreement there is a recital in the fourth WHEREAS clause that "50% of the economic interest" of C-S Aviation Services, Inc. (a company wholly-owned by PC Chatterjee) is "shared with SFM LLC".

5.      In or about 2000, SFM LLC engaged Soros Private Funds Management, LLC, a Delaware limited liability company ("SPFM"), to manage Quantum's strategic investment program for SFM LLC. One of the investments in Quantum's strategic program was its investment in the aforementioned aircraft leasing business. SPFM continued to manage such program for SFM until December 31, 2003 when it was merged with and into SFM LLC. During the entire period that SPFM managed Quantum's strategic investment program for SFM LLC, Mr. Soros was the sole manager of SPFM.

Declared under the penalties of perjury this _6_ day of July, 2006 in New York, York.

_____
Daniel Eule

2

# CERTIFICATE

The undersigned, Armando T. Belly, General Counsel of Soros Fund Management LLC, hereby certifies that attached hereto is a true and correct copy of the Certificate of Formation of Soros Fund Management LLC.

_____
Armando T. Belly

State of New York
County of New York

Subscribed and sworn to before me

this 28th day of June 2004

_____
        Notary Public

MYRA R. COHEN
Notary Public, State of New York
No. 01CO4992681
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires March 2, 20 ᴏ5

Ex A

*Office of the Secretary of State*

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF LIMITED LIABILITY COMPANY OF "SOROS FUND MANAGEMENT LLC", FILED IN THIS OFFICE ON THE THIRTY-FIRST DAY OF OCTOBER, A.D. 1996, AT 11:30 O'CLOCK A.M.



Edward J. Freel, Secretary of State

2679102   8100

960317470

AUTHENTICATION:     8172710

DATE:

10-31-96

## CERTIFICATE OF FORMATION

### OF

### SOROS FUND MANAGEMENT LLC

This Certificate of Formation of Soros Fund Management LLC (the "LLC"), dated as of October 31, 1996 is being duly executed and filed by Sean C. Warren, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. §18-101, et seq.).

FIRST. The name of the limited liability company formed hereby is Soros Fund Management LLC.

SECOND. The address of the registered office of the LLC in the State of Delaware is c/o The Corporation Trust Company, The Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

THIRD. The name and address of the registered agent for service of process on the LLC in the State of Delaware is The Corporation Trust Company, The Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first above written.

Sean C. Warren
Authorized Person

## MASTER CONTRIBUTION, ASSIGNMENT AND ASSUMPTION

MASTER CONTRIBUTION, ASSIGNMENT AND ASSUMPTION dated as of January 1, 1997 by and among GEORGE SOROS, a United States citizen ("Soros"), SOROS FUND MANAGEMENT, a sole proprietorship of which Soros is the sole proprietor ("SFM" and together with Soros, the "Assignors"), and SOROS FUND MANAGEMENT LLC, a Delaware limited liability company ("Assignee").

*Recitals:--*

A.  SFM is an investment advisory firm the principal business of which is to serve, pursuant to contract, as the principal investment manager to several foreign investment companies.

B.  Soros is the sole proprietor of SFM and has determined to incorporate the business of SFM into a limited liability company of which he will be a member and the Chairman of the management committee.

C.  Assignors and Assignee wish to provide, among other things, for (a) the transfer to Assignee of the assets, properties, rights and interests set forth herein which are used in connection with the business of SFM; and (b) the assumption by Assignee of certain related obligations and liabilities, effective as of the date hereof.

In consideration of the foregoing and for other good and valuable consideration the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.  **Contribution and Assignment of Assets**

    1.1  Assignors hereby irrevocably and unconditionally transfer, assign and convey, by way of contribution, to Assignee, to have and to hold forever, all of Assignors' entire right, title and interest as of the date hereof of and in:

        1.1.1  the employment contracts between SFM and any employee;

        1.1.2  the leasehold interests at 888 Seventh Avenue, New York, New York;

        1.1.3  all rights and interests in, to and under all other contracts related to the business of SFM, other than those contracts being assigned on even date herewith pursuant to that separate agreement attached hereto as Exhibit A;

        1.1.4  all fixtures, fittings, furniture and equipment, records, files, books of account and computer data used in the business of SFM;

        1.1.5  all of the rights and interests in, to and under all licenses, regulatory authorizations and approvals related to the business of SFM;

Ex B

1.1.6   SFM's legal and beneficial ownership interests in the entities set forth on Schedule 1, and all rights and interests thereto;

1.1.7   the following service marks: "Soros Fund", "Soros Fund Management" and "SFM", together with the goodwill of the business connected with the use of and symbolized by those marks, as well as the right to sue for past infringement of those marks;

1.1.8   all rights to the goodwill associated with the business of SFM or the other Transferred Assets (as defined below), including the right to represent to third parties that the Assignee is the successor to the business of SFM;

1.1.9   all other assets, properties, rights and interests of any kind whatsoever of SFM;

1.1.10  all other assets, properties, rights and interests of any kind whatsoever of Soros which are used in connection with the business of SFM.

1.2   Notwithstanding the foregoing, there shall be no contribution and assignment by Assignors of any rights of Assignors relating to the following (collectively, the "Excluded Assets"):

1.2.1   any assets to the extent (but only to the extent) that the assignment to Assignee would constitute a breach by either of the Assignors of any obligations or would result in releasing any obligor from any obligation to either of the Assignors (without substituting Assignee in place of Assignors as the obligee);

1.2.2   all deferred compensation receivables attributable to services performed for periods ending on or prior to December 31, 1996 (including increases and/or decreases after that date attributable to changes in index value).

The assets and rights described in Section 1.1, excluding the Excluded Assets, are referred to herein as the "Transferred Assets".

1.3   Assignors make no representation or warranty whatsoever regarding the value or condition of the Transferred Assets.

## 2.   Assumption of Obligations and Liabilities

2.1   Assignee hereby irrevocably and unconditionally assumes all obligations and liabilities related to (a) the Transferred Assets, including, without limitation, all obligations to pay deferred compensation attributable to services performed for periods commencing on or after the date hereof (or as otherwise provided in

Section 3.2 hereof), including without limitation under the Soros Fund Management LLC Managing Directors' Incentive Compensation Plan; and (b) the SFM Notes and the SFM Contingent Payment Notes (as such terms are defined in the Software Purchase Agreement among Quantitative Analysis Service, Inc., Duquesne Capital Management, L.L.C. and SFM) for periods beginning on or after January 1, 1997 (collectively, the "Assumed Liabilities").

2.2 Notwithstanding anything contained herein to the contrary, the assumption of obligations and liabilities related to the Transferred Assets by Assignee does not include any of the following (the "Retained Liabilities"):

2.2.1 any obligations and liabilities to the extent (but only to the extent) that such assumption would constitute a breach by either of the Assignors of any obligations or would result in releasing any obligor from any obligation to either of the Assignors (without substituting Assignee in place of either Assignor as the obligee);

2.2.2 any obligations and liabilities relating in any manner to the Excluded Assets (whenever arising), including deferred compensation payables attributable to services performed for periods ending on or prior to December 31, 1996 (including increases and/or decreases after that date attributable to changes in index value);

2.2.3 any obligations and liabilities relating in any manner to the SFM Notes and the SFM Contingent Payment Notes for periods ending on or prior to December 31, 1996.

2.3 Assignors hereby agree to the substitution of Assignee in their places as obligor with respect to all the Transferred Assets and Assumed Liabilities.

## 3. Other Agreements

3.1 Assignee hereby agrees to issue to Soros a membership interest in the Assignee on the terms set out in the limited liability company agreement of the Assignee.

3.2 Assignee and Assignors hereby agree that (a) Assignee will pay to SFM all compensation received by Assignee for Quantum Emerging Growth Partners, C.V. (fiscal year end March 31, 1997) and Quasar International Partners, C.V. (fiscal year end January 31, 1997) in respect of services performed on or after the date hereof and through the end of the current fiscal year of the relevant fund and (b) SFM will retain all obligations and liabilities relating to incentive compensation payables (whether or not deferred) attributable to such funds for the period from and including the date hereof through the end of the current fiscal

year of the relevant fund, which obligations and liabilities will be treated as Retained Liabilities hereunder.

3.3    Soros hereby irrevocably and unconditionally grants to Assignee an option to purchase Soros' entire legal and beneficial ownership interests in those entities set forth on Schedule 2 hereof and/or substantially all of the assets and liabilities of such entities. Such right may be exercised by the Assignee at any time and from time to time before or after the death of Soros, in whole or in part. The purchase price for such assets shall in each case be the book value thereof.

3.4    Soros hereby agrees that, from and after the date hereof, he will not sell, transfer, assign or otherwise dispose of any of his legal or beneficial ownership interests in those entities set forth on Schedule 2 hereof and/or substantially all of the assets and liabilities of such entities without the prior written consent of the Assignee.

3.5    Soros hereby agrees, from and after the date hereof, to use his best efforts to cause the general partner or manager of each of the entities listed on Schedule 3 to act at the direction of the Assignee. The provisions of this paragraph shall terminate as to any such entity upon the earlier of (a) the assignment to Assignee of the legal and beneficial ownership interests in the general partner of such entity and (b) the assignment to Assignee of the general partnership interest or manager interest in such entity, in each case pursuant to the exercise of the option granted by the preceding paragraph or otherwise.

3.6    Attached hereto as Exhibit B is a separate agreement to be entered into on even date herewith with respect to, among other matters, the granting by Soros of a certain further option to Assignee.

3.7    Soros hereby irrevocably and unconditionally grants to Assignee an option to purchase Soros' entire legal and beneficial ownership interests in each of Soros Global Research LDC and Soros Global Research, Inc. and/or substantially all of the assets and liabilities of each such entity. Such right may be exercised by the Assignee in whole but not in part at any time from the death of Soros until one year thereafter. The purchase price for such assets shall be the fair market value thereof, as agreed between the parties, or, failing agreement, as determined by an independent accounting firm or other valuation expert appointed by and at the expense of the Assignee.

3.8    Assignee hereby irrevocably and unconditionally grants to Soros and his successors an option to sell to Assignee Soros' legal and beneficial ownership interests in each of Soros Global Research LDC and Soros Global Research, Inc. and/or substantially all of the assets and liabilities of each such entity. Such right may be exercised in whole but not in part by Soros' lawful representatives at any

time from the death of Soros until one year thereafter. The purchase price for such assets shall be the fair market value thereof, as agreed between the parties, or, failing agreement, as determined by an independent accounting firm or other valuation expert appointed by and at the expense of the Assignee.

## 4    Indemnification

4.1    The Assignors shall jointly and severally indemnify Assignee and hold it harmless from and against any liability that it may suffer or incur, directly or indirectly, by reason of or resulting from the Retained Liabilities.

4.2    The Assignee shall indemnify and hold harmless (a) each of the Assignors from and against any liability that either may suffer or incur, directly or indirectly, by reason of or resulting from (i) the Assumed Liabilities, or (ii) any guarantees given by either of the Assignors in connection with the Transferred Assets or any other interest transferred to Assignee pursuant to this Agreement, including, without limitation, that certain Deed of Guarantee dated October 28, 1994 given by Soros in favor of State Street Cayman Trust Company Limited, Asian Infrastructure Fund Managment Company Limited L.D.C and The Asian Infrastructure Fund guaranteeing the obligation of SFM Advisory Holdings, L.P. under a certain Escrow Agreement dated October 28, 1994; and (b) Soros from and against any liability that he may suffer or incur, directly or indirectly, by reason of or resulting from his acting at the direction of the Assignee in accordance with Section 3.4 hereof.

## 5.    Further Assurances

5.1    Assignors and Assignee each undertake and agree to execute all such further instruments, certificates and other documents, and to take all such other actions, as may be reasonably requested by the other in order more fully to vest in the other all rights, privileges and other incidents of ownership with respect to the assets transferred and the liabilities and obligations assumed pursuant to this agreement, and the other matters contemplated hereby.

5.2    With respect to each of the items referred to in Sections 1.2.1 and 2.2.1, each of the parties undertakes to use its best efforts to obtain as promptly as is practicable all such consents and approvals as may be required in order to permit such items to be transferred to Assignee. Pending the completion of such transfers, the parties acknowledge that they intend for each of them to be placed in the same economic position that it would have experienced if the transfers of such items had been completed effective as of the date hereof. To that end:

5.2.1    all proceeds of any such items shall be remitted by Assignors to Assignee as promptly as it is practicable to do so; and

5.2.2 Assignee shall indemnify Assignors and hold them harmless from and against any liability that they may suffer or incur by reason of the inability of Assignors to effect any such transfer as of the date hereof.

5.3 Assignors shall promptly remit to Assignee any asset or other item transferred to or assumed by Assignee pursuant to this agreement, together with all fruits or proceeds thereof and all appurtenant instruments, certificates, agreements and other documents related thereto, and, following the date hereof, Assignors shall promptly remit to Assignee any cash or other property received by them attributable to any asset or other item transferred to or assumed by Assignee pursuant to this agreement. Pending such remittance, Assignors shall hold all such property in trust for the exclusive benefit of Assignee.

5.4 Following the date hereof, Assignee shall promptly remit to Soros any cash or other property received by it attributable to any asset or other item not transferred to or assumed by Assignee pursuant to this agreement. Pending such remittance, Assignee shall hold all such property in trust for the exclusive benefit of Soros.

5.5 Following the date hereof, Assignee shall permit the Assignors and their authorized representatives to have access to, and examine and make copies of, all books and records of the business of SFM for all purposes that relate to transactions or events occurring on or prior to December 31, 1996.

## 6. Governing Law

6.1 This agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

## 7. Successors and Assigns

7.1 This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective heirs, legatees, legal representatives, successors and permitted assigns.

IN WITNESS WHEREOF, the parties have executed this agreement as of the day and year first above written.

SOROS FUND MANAGEMENT

By _____

GEORGE SOROS

_____

SOROS FUND MANAGEMENT LLC

By _____

## SFM ownership interests to be transferred

1.   SC Management Co., Inc.

2.   SFM India Advisory Limited

## Soros Interests Subject of Option to Purchase

1.   SFM AH, Inc.

2.   Quastro N.V.

3.   QS Management Corp.

## Soros GP Partnerships or Managed LLCs

1.     Quantum Realty Partners, L.P.

2.     SFM Advisory Holdings, L.P.

3.     SFM Participation, L.P.

4.     Quasar Fund Management C.V.

5.     Emerging Growth Fund Management C.V.

6.     QS International Partners C.V.

7.     S-C Global Holdings L.L.C.

Exhibit 4

## CONTRIBUTION, ASSIGNMENT AND ASSUMPTION
## OF
## INVESTMENT ADVISORY AGREEMENTS

CONTRIBUTION, ASSIGNMENT AND ASSUMPTION OF INVESTMENT ADVISORY AGREEMENTS dated as of January 1, 1997 by and among GEORGE SOROS, a United States citizen ("Soros"), SOROS FUND MANAGEMENT, a sole proprietorship of which Soros is the sole proprietor ("SFM" and together with Soros, the "Assignors"), and SOROS FUND MANAGEMENT LLC, a Delaware limited liability company ("Assignee").

*Recitals:--*

A.   SFM is an investment advisory firm the principal business of which is to serve, pursuant to contract, as the principal investment manager to several foreign investment companies.

B.   Soros is the sole proprietor of SFM and has determined to incorporate the business of SFM into a limited liability company of which he will be a member and the Chairman of the management committee.

C.   Assignors and Assignee wish to provide, among other things, for (a) the assignment by Assignors to Assignee of certain investment management and investment advisory agreements set forth herein; and (b) the assumption by Assignee of the obligations and liabilities under such investment management and investment advisory agreements, effective as of the date hereof.

In consideration of the foregoing and for other good and valuable consideration the receipt of which is hereby acknowledged, the parties hereby agree as follows:

### 1.   Contribution and Assignment of Assets

1.1   Assignors hereby irrevocably and unconditionally transfer, assign and convey, by way of contribution, to Assignee, to have and to hold forever, all of Assignors' entire right, title and interest to and in the investment management and investment advisory agreements listed on Schedule 1 as in effect on the date hereof.

1.2   Notwithstanding the foregoing, there shall be no contribution and assignment by Assignors of any rights of Assignors relating to any assets (the "Excluded Assets") to the extent (but only to the extent) that the assignment to Assignee would constitute a breach by either of the Assignors of any obligations or would result in releasing any obligor from any obligation to either of the Assignors (without substituting Assignee in place of Assignors as the obligee).

The assets and rights described in Section 1.1, excluding the Excluded Assets, are referred to herein as the "Transferred Assets".

1.3     Assignors make no representation or warranty whatsoever regarding the value of the Transferred Assets.

## 2.    Assumption of Obligations and Liabilities

2.1     Assignee hereby irrevocably and unconditionally assumes all obligations and liabilities related to the Transferred Assets (the "Assumed Liabilities").

2.2     Notwithstanding anything contained herein to the contrary, the assumption of obligations and liabilities related to the Transferred Assets by Assignee does not include any of the following (the "Retained Liabilities"):

     2.2.1    any obligations and liabilities to the extent (but only to the extent) that such assumption would constitute a breach by either of the Assignors of any obligations or would result in releasing any obligor from any obligation to either of the Assignors (without substituting Assignee in place of Assignor as the obligee);

     2.2.2    any obligations and liabilities relating in any manner to the Excluded Assets (whenever arising).

2.3     Assignors hereby agree to the substitution of Assignee in their places as obligor with respect to all the Transferred Assets and Assumed Liabilities.

## 3    Indemnification

3.1     The Assignors shall jointly and severally indemnify Assignee and hold it harmless from and against any liability that it may suffer or incur, directly or indirectly, by reason of or resulting from the Retained Liabilities.

3.2     The Assignee shall indemnify and hold harmless each of the Assignors from and against any liability that either may suffer or incur, directly or indirectly, by reason of or resulting from (a) the Assumed Liabilities or (b) any guarantees given by either of the Assignors in connection with the Transferred Assets, including, without limitation, under the Soros Advisory Guarantee dated December 9, 1994, from, among others, Soros in favor of the limited partners from time to time party to a partnership agreement referred to therein, guarantying certain obligations of S-C Global Holdings L.L.C. under the Advisory Agreement dated December 9, 1994.

## 4.    Further Assurances

4.1     Assignors and Assignee each undertake and agree to execute all such further instruments, certificates and other documents, and to take all such other actions,

as may be reasonably requested by the other in order more fully to vest in the other all rights, privileges and other incidents of ownership with respect to the assets transferred and the liabilities and obligations assumed pursuant to this agreement, and the other matters contemplated hereby.

4.2     With respect to each of the items referred to in Sections 1.2 and 2.2.1, each of the parties undertakes to use its best efforts to obtain as promptly as is practicable all such consents and approvals as may be required in order to permit such items to be transferred to Assignee. Pending the completion of such transfers, the parties acknowledge that they intend for each of them to be placed in the same economic position that it would have experienced if the transfers of such items had been completed effective as of the date hereof. To that end:

    4.2.1   all proceeds of any such items shall be remitted by Assignors to Assignee as promptly as it is practicable to do so; and

    4.2.2   Assignee shall indemnify Assignors and hold them harmless from and against any liability that they may suffer or incur by reason of the inability of Assignors to effect any such transfer as of the date hereof.

4.3     Assignors shall promptly remit to Assignee any asset or other item transferred to or assumed by Assignee pursuant to this agreement, together with all fruits or proceeds thereof and all appurtenant instruments, certificates, agreements and other documents related thereto, and, following the date hereof, Assignors shall promptly remit to Assignee any cash or other property received by them attributable to any asset or other item transferred to or assumed by Assignee pursuant to this agreement. Pending such remittance, Assignors shall hold all such property in trust for the exclusive benefit of Assignee.

4.4     Following the date hereof, Assignee shall promptly remit to Soros any cash or other property received by it attributable to any asset or other item not transferred to or assumed by Assignee pursuant to this agreement. Pending such remittance, Assignee shall hold all such property in trust for the exclusive benefit of Soros.

## 5.     Governing Law

5.1     This agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

## 6.     Successors and Assigns

6.1     This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective heirs, legatees, legal representatives, successors and permitted assigns.

IN WITNESS WHEREOF, the parties have executed this agreement as of the day and year first above written.

SOROS FUND MANAGEMENT

By_____

GEORGE SOROS

_____

SOROS FUND MANAGEMENT LLC

By_____

## Investment management and investment advisory contracts

1.  Investment Advisory Agreement between SFM and Quantum Fund N.V.

2.  Investment Advisory Agreement between SFM and Quota Fund N.V.

3.  Investment Advisory Agreement between SFM and Quasar International Partners C.V.

4.  Investment Advisory Agreement between SFM and Quantum Emerging Growth Partners C.V.

5.  Investment Advisory Agreement among SFM, Quantum Realty Fund Limited and QRF I Ltd.

6.  Investment Advisory Agreement between SFM and Quantum Industrial Holdings Ltd.

7.  Investment Consulting Agreement among SFM, Argentina High Yield & Capital Appreciation Fund Ltd. and Consultores Fund Management Limited.

8.  Amended and Restated Advisory Agreement among SFM, GPI LDC, S-C Global Holdings, L.L.C. and, solely for the purpose of Section 6 of the agreement, the limited partners from time to time of Global Investments, L.P.

# OPTION AGREEMENT

OPTION AGREEMENT dated as of January 1, 1997 by and between GEORGE SOROS, a United States citizen ("Soros"), and SOROS FUND MANAGEMENT LLC, a Delaware limited liability company ("SFM LLC").

*Recitals:--*

A.   Soros Fund Management ("SFM") is an investment advisory firm the principal business of which is to serve, pursuant to contract, as the principal investment manager to several foreign investment companies.

B.   Soros is the sole proprietor of SFM and has determined to incorporate the business of SFM into a limited liability company of which he will be a member and the Chairman of the management committee.

C.   Soros, SFM and SFM LLC have entered into a Master Contribution, Assignment and Assumption agreement, on even date herewith, providing for, among other things, (a) the transfer to SFM LLC of the assets, properties, rights and interests of Soros and SFM set forth therein which are used in connection with the business of SFM and (b) the assumption by SFM LLC of certain related obligations and liabilities (collectively, the "Assignment and Assumption").

D.   In connection with the Assignment and Assumption, Soros and SFM LLC wish to provide for, among other things, (a) the granting by Soros to SFM LLC of an option to purchase Soros' legal and beneficial ownership in a certain entity and (b) an undertaking by Soros with respect to the direction of such entity.

In consideration of the foregoing and for other good and valuable consideration the receipt of which is hereby acknowledged, the parties hereby agree as follows:

## 1.   Option and Agreement as to Direction

1.1   Soros hereby irrevocably and unconditionally grants to SFM LLC an option to purchase Soros' entire legal and beneficial ownership interest in QIH Management, Inc. or substantially all of the assets and liabilities of such entity. Such right may be exercised by SFM LLC in whole but not in part at any time before or after the death of Soros. The purchase price for such assets shall be the book value thereof.

1.2   Soros hereby agrees, from and after the date hereof, to use his best efforts to cause QIH Management, Inc., as the general partner of QIH Management Investor, L.P., to act at the direction of SFM LLC. The provisions of this paragraph shall terminate upon the earlier of (a) the assignment to SFM LLC of the legal and beneficial ownership interest in QIH Management, Inc. and (b) the

assignment to SFM LLC of the general partnership interest in QIH Management Investor, L.P., in each case pursuant to the exercise of the option granted by the preceding paragraph or otherwise.

1.3     Soros hereby agrees that, from and after the date hereof, he will not sell, transfer, assign or otherwise dispose of any of his legal or beneficial ownership interest in QIH Management, Inc. and/or substantially all of the assets and liabilities of such entity without the prior written consent of SFM LLC.

## 2.     Indemnification

2.1     SFM LLC shall indemnify and hold harmless Soros from and against any liability that he may suffer or incur, directly or indirectly, by reason of or resulting from his acting at the direction of SFM LLC in accordance with the provisions of this Agreement.

## 3.     Further Assurances

3.1     Soros and SFM LLC each undertake and agree to execute all such further instruments, certificates and other documents, and to take all such other actions, as may be reasonably requested by the other in order more fully to vest in the other all rights and privileges contemplated hereby.

## 4.     Governing Law

4.1     This agreement shall be governed by and construed in accordance with the internal laws of the State of New York.

## 5.     Successors and Assigns

5.1     This Agreement shall be binding on and inure to the benefit of the parties hereto and their respective heirs, legatees, legal representatives, successors and permitted assigns.

IN WITNESS WHEREOF, the parties have executed this agreement as of the day and year first above written.

GEORGE SOROS

_____

SOROS FUND MANAGEMENT LLC

By_____

# AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.

ATTORNEYS AT LAW

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

590 MADISON AVENUE
20TH FLOOR
NEW YORK, NEW YORK 10022
(212) 872-1000
FAX (212) 872-1002
www.akingump.com

AUSTIN
BRUSSELS
DALLAS
HOUSTON
LONDON
LOS ANGELES
MOSCOW
NEW YORK
PHILADELPHIA
SAN ANTONIO
WASHINGTON

March 9, 1999

PLEASE DELIVER _____ PAGE(S) (Including Cover Sheet) TO THE FOLLOWING:

| Name(s) (up to 6 recipients) | Facsimile Number(s) (Indicate if metro) | Company Number(s) (Indicate if metro) |
|---|---|---|
| Peter Hurwitz | (212) 262-9637 | ( ) |
| | ( ) | ( ) |
| | ( ) | ( ) |
| | ( ) | ( ) |
| | ( ) | ( ) |
| | ( ) | ( ) |

FROM:   Jay A. Schoenfarber        PHONE: (212) 872-1076        Floor: 18

RE:   C-S Aviation

## Comments/Special Instructions

As per our phone, attached hereto are clean copies of each of the Allocation Agreement and the Incentive Agreement. The Side Guarantee is being forwarded to you directly by Morgan Stanley, as the agreement is now on their system. Please feel free to call me with any questions or comments.

JAS

The information contained in this facsimile message is attorney-client privileged and confidential, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the U.S. Postal Service.

CLIENT/MATTER NO.:        031416 - 0001

USER I.D.: 030228        SECRETARY:        EXT.:

☐ Return fax via Interoffice Mail    ☐ Hold fax for pickup    Fax Operator Verification: _____

☐ Attention Akin, Gump fax operator, please call Attorney at home if there are any problems transmitting this document.

EX C

CONFIDENTIAL   GS 002828

# ALLOCATION AGREEMENT

THIS ALLOCATION AGREEMENT (the "Agreement") is made this __ day of February, 1999 among Quantum Industrial Partners LDC, a Cayman Islands limited duration company ("QIP"), S-C Aviation Investments, Inc., a Delaware corporation ("S-C Aviation"), Winston Partners II LDC, a Cayman Islands limited duration company ("Winston LDC"), Winston Partners II LLC, a Delaware limited liability company ("Winston LLC"), Winston Partners, L.P., a Delaware limited partnership ("Winston Partners"), C-S Aviation Services, Inc. a Delaware corporation ("C-S Aviation") and PC Chatterjee ("Chatterjee").

WHEREAS, each of QIP, S-C Aviation, Winston LDC, Winston LLC and Winston Partners directly or indirectly hold membership interests in S-C Aircraft Holdings LLC, a Delaware limited liability company, an entity that owns certain aircraft; and

WHEREAS, each of S-C Aviation, Winston LDC and Winston LLC hold membership interests in P-G Aircraft Holdings LLC, a Delaware limited liability company, an entity that owns certain aircraft; and

WHEREAS, each of QIP, S-C Aviation and Winston Partners indirectly own certain aircraft; and

WHEREAS, C-S Aviation is an aircraft leasing and aviation management and services company wholly-owned by Chatterjee, 50% of the economic interest of which is shared with Soros Fund Management LLC ("SFM LLC"); and

WHEREAS, the parties to this Agreement desire to sell (the "Sale") all of the aircraft owned by such parties, directly or indirectly (the "Aircraft"), and all of the capital stock of C-S Aviation (the "Shares," and together with the Aircraft, the "Assets")

NOW, THEREFORE, in consideration of the premises and the representations, warranties, covenants and agreements contained herein and the agreements contemplated hereby, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

1. **Allocation.**

1.1     Allocation Value.  The parties intend to sell the Assets to a third party (the "Purchaser") through Morgan Stanley & Co. Incorporated ("MS").  The parties intend to share the proceeds received in the Sale after the payment of all fees, expenses and transfer taxes, if any (the "Aggregate Net Proceeds"), in a manner to be mutually agreed upon by the parties hereto

CONFIDENTIAL    GS 002829

pursuant to a separate agreement. If no such agreement is reached by February 23, 1999, the proposal presented by SFM LLC shall govern.

    1.2    Creation of a Special Purpose Entity. If, prior to the sale of any Asset, a special purpose entity is created and ownership of any or all of the Assets is transferred to that entity, then the Aggregate Net Proceeds shall be shared by the parties in accordance with the ownership interests in such entity.

    1.3    Hainan Airlines. It is contemplated that all of the member interests of American Aviation LDC, a Cayman Islands limited duration company ("AA LDC") may be sold in connection with the Sale. The net proceeds received for the member interests will be allocated proportionately among the owners of such member interests.

## 2. Fees And Expenses.

    2.1    Bravia. Each of the parties hereto and [Bravia ___, a _____ ("Bravia")] have agreed to enter into an incentive agreement (the "Incentive Agreement"), a form of which is attached hereto as Exhibit A, in order to incentivize the management of C-S Aviation in connection with the Sale. Pursuant to the terms of the Incentive Agreement, Bravia shall receive a fee as set forth in detail in the Incentive Agreement (the "Bravia Fee").

    2.2    Offering Expenses. Each party agrees to pay its Proportionate Share of all of the fees, expenses and transfer taxes, if any, in connection with the Sale (whether or not a Sale occurs), including, without limitation, the Bravia Fee and the fees and expenses of MS, Akin, Gump, Strauss, Hauer & Feld, L.L.P and PricewaterhouseCoopers and all other fees and expenses incurred incident to the negotiation, preparation, execution, delivery and performance of this Agreement and the Sale. A party's proportionate share of an expense shall be equal to the percentage derived by dividing the aggregate proceeds a party is entitled to pursuant to the Sale by the Aggregate Net Proceeds (the "Proportionate Share.") To the extent any party pays any amount under that certain Side Guarantee dated ____, 1999, each party hereto agrees to reimburse the party making such payment to such extent as is necessary such that each party hereto bears its Proportionate Share of amount so paid under such Side Guarantee.

    2.3    Other Obligations. In connection with any ongoing obligations incurred by the parties hereto in connection with the Sale, including post-closing indemnification obligations, each party agrees to bear its Proportionate Share of such obligations.

## 3. Miscellaneous.

    3.1    C-S Aviation Securitization. Reference is made to that certain Series D Tranche and the total return swap related thereto entered into by QIP on behalf of itself, Mr. George Soros ("Mr. Soros") and [Winston ]. Upon receipt of the proceeds of the Sale, each of Mr. Soros and [Winston] shall open an escrow or collateral account which shall contain sufficient funds, and be pledged in favor of QIP, to satisfy their respective obligations arising from the Series D Tranche, in such form as QIP shall reasonably request.

CONFIDENTIAL    GS 002830

3.2     Entire Agreement; Amendments. This Agreement, together with the Exhibits and Schedules hereto contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters.

3.3     Amendments; Waivers. No provision of this Agreement may be waived or amended except in a written instrument signed, in the case of an amendment, by all of the parties hereto; or, in the case of a waiver, by the party against whom enforcement of any such waiver is sought. No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of either party to exercise any right hereunder in any manner impair the exercise of any such right accruing to it thereafter.

3.4     Headings; Interpretive Matters. The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof. No provision of this Agreement will be interpreted in favor of, or against, any of the parties hereto by reason of the extent to which any such party or its counsel participated in the drafting thereof or by reason of the extent to which any such provision is inconsistent with any prior draft hereof or thereof.

3.5     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns. No party may assign this Agreement or any rights or obligations hereunder without the prior written consent of each of the other parties.

3.6     No Third-Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

3.7     Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without regard to the principles of conflicts of law thereof. Each party hereby irrevocably submits to the nonexclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consent to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices (set forth on the signature page) to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.

CONFIDENTIAL    GS 002831

3.8    Execution. This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature page were an original thereof.

3.9    Severability. In case any one or more of the provisions of this Agreement shall be invalid or unenforceable in any respect, the validity and enforceability of the remaining terms and provisions of this Agreement shall not in any way be affecting or impaired thereby and the parties will attempt to agree upon a valid and enforceable provision which shall be a reasonable substitute therefor, and upon so agreeing, shall incorporate such substitute provision in this Agreement.

CONFIDENTIAL    GS 002832

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

QUANTUM INDUSTRIAL PARTNERS LDC

By:
Name:
Title:                    MICHAEL C. NEUS
Address:                  Attorney-In-Fact

S-C AVIATION INVESTMENTS, INC.

By:
Name:
Title:
Address:

GEORGE SOROS

By:
Name:
Title:
Address:

WINSTON PARTNERS II LDC

By:
Name:    Peter Hurwitz
Title:   Manager  Attorny -.i-faut
Address:

031011.0024  100040 v5                5

CONFIDENTIAL    GS 002833

WINSTON PARTNERS II LLC, by
Chatterjee Advisors LLC its Manager

By: _____

Name:      Peter Hurwitz
Title:       Manager
Address:


WINSTON PARTNERS, L.P.

     By:     Chatterjee Fund Management, L.P.,
              its General Partner

            By:     Purnendu Chatterjee,
                   its General Partner

            By: _____
            Name:     Peter Hurwitz
            Title:     Attorney-in-Fact
            Address:


C-S AVIATION SERVICES, INC.

By: _____
Name:    BHARAT BHISE
Title:
Address:   PRESIDENT


PURNENDU CHATTERJEE

_____
Attorny-in-fact

CONFIDENTIAL    GS 002834

# INCENTIVE AGREEMENT

THIS INCENTIVE AGREEMENT (the "Agreement") is made this __ day of February, 1999 among Bravia __, a _____ ("Bravia"), Quantum Industrial Partners LDC, a Cayman Islands limited duration company ("QIP"), S-C Aviation Investments, Inc., a Delaware corporation ("S-C Aviation"), Winston Partners II LDC, a Cayman Islands limited duration company ("Winston LDC"), Winston Partners II LLC, a Delaware limited liability company ("Winston LLC"), Winston Partners, L.P., a Delaware limited partnership ("Winston Partners"), and Purnendu Chatterjee ("Chatterjee") and, other than Bravia, collectively, the "Sellers").

WHEREAS, each of the Sellers indirectly own aircraft; and

WHEREAS, C-S Aviation Services, Inc. ("C-S Aviation") is an aircraft leasing and aviation investment company owned by Chatterjee, 50% of the economic interest of which is shared with Soros Fund Management LLC; and

WHEREAS, in order to incentivize the management of C-S Aviation, who are, generally, also shareholders of Bravia, in connection with the sale of the capital stock of C-S Aviation as well as a number of aircraft held indirectly by the Sellers, the sale of stock in American Aviation LDC and spare parts and other aviation services, each of the parties hereto desire to enter into this Incentive Agreement;

NOW, THEREFORE, in consideration of the premises and the representations, warranties, covenants and agreements contained herein and the agreements contemplated hereby, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## 1.    Incentive Allocation.

1.1    <u>Fee to Bravia.</u>  Within 15 days after the receipt of proceeds from the sale of more than 50% of the total value of the Aircraft Assets (as defined in that certain engagement letter with Morgan Stanley dated as of February __, 1999, but including for the purposes of this Agreement 727-100's, 767's and F-50's) on or before December 31, 1999 (the "Sale"), each of the undersigned hereby agree that a payment, as set forth below, will be made to Bravia (the "Bravia Fee") to be allocated as set forth on Schedule 1A to the persons set forth on such Schedules to the extent that they are employed by C-S Aviation at the closing of the Sale (with the unallocated portion allocated by Bharat Bhisé, with the consent of the Sellers). If, as a result of any person listed on such Schedule 1A not being entitled to payment, the amount such person would be entitled to receive shall, the extent not allocated by Bharat Bhisé (with the consent of the Sellers) to one or more replacement shareholders/employees, be allocated among the persons

CONFIDENTIAL   GS 002835

receiving a portion of the Bravia Fee, in proportion to the amount of such fee paid to such person. The "Sale Price" as set forth below shall be the value of the consideration paid for the common equity of C-S Aviation, plus the value of the Aircraft Assets actually sold, including any debt, capital lease, and preferred stock obligations of C-S Aviation or Aircraft Assets assumed, retired or defeased in connection with the transaction, but excluding any investments made (cash, new airplanes, conversion costs, or added value) in the Aircraft Assets after March 31, 1999. Any amounts to be paid by the buyer contingent upon future events (including escrow) shall be estimated for the purposes of calculating the Sale Price as the current value of the expected payment to be received based upon the expected likelihood of payment, which calculation shall be mutually agreeable to all parties hereto at the time of closing.

| Sale Price | Fee Basis |
|---|---|
| $0-$449,999.99mm | No fee |
| $450-549,999.99mm | $1mm plus 4% of the excess over $450mm |
| $550m+ | $5mm plus 8% of the excess over $550mm |

1.2  Condition to Payment. As a condition to payment of the Bravia Fee, (a) the form and structure of Bravia shall be acceptable to the Sellers, (b) there shall be no modification to the terms or the amount to be paid to the individual employees or shareholders of Bravia, set forth on Schedule 1A without written consent of all the Sellers, (c) Bravia shall have performed as contemplated by Section 1.3 and (d) the agreements contemplated by Section 1.4 shall be entered into.

1.3  Bravia Actions. Bravia and its shareholders will act, as an independent contractor, to assist the Sellers and Soros Fund Management LLC ("SFM") in connection with Sale process and act generally at the direction of SFM and the Sellers. As part of this effort, Bravia will cooperate with the investment bank selected to assist in the Sale effort. In the event the Sellers determine not to proceed with a Sale, Bravia will assist in any recapitalization efforts as directed by SFM. Such actions will be in addition to the activities of Bravia shareholders in their capacity as employees of C-S Aviation.

1.4  Certain Agreements. A severance agreement ("Severance Agreement") between one or more of the Sellers and the Bravia employees set forth on Schedule 1B will be executed. Pursuant to the Severance Agreement, each Bravia employee whose employment is terminated by the purchaser in any Sale transaction within 360 days of closing of the Sale will continue to receive a monthly base salary equivalent to the base salary in effect at the time the Severance Agreement is executed, unless the purchaser agrees to make such payments, equal to the number of months set forth in Schedule 1B less the number of months that elapsed prior to such employees' termination (but not less than zero).. Additionally, Bharat Bhisé, Jim Walsh and Tom Seery will agree to enter into a non-compete agreement in a form reasonably acceptable to the Sellers, for a term commencing on the date of the Sale and continuing for half the number of months specified in Schedule 1B. The non-compete agreement will restrict direct competition (activities involving organizing and operating a similar business) and employment with a

CONFIDENTIAL  GS 002836

competing organization. However, part-time consulting work in a similar business will, as delineated in such agreement, be permitted.

    1.5    Alternative Recapitalization. In the event the Sellers determines not to proceed with the Sale and opt, instead, to recapitalize their investment, Bravia and the Sellers will discuss entering into a mutually acceptable alternative incentive arrangement.

    1.6    No Obligation. The Sellers shall not be obligated to so recapitalize (or enter into such related alternative incentive arrangement) or engage in a Sale.

## 2. Miscellaneous.

    2.1    Entire Agreement; Amendments. This Agreement, together with the Exhibits and Schedules hereto contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters.

    2.2    Amendments; Waivers. No provision of this Agreement may be waived or amended except in a written instrument signed, in the case of an amendment, by all of the parties hereto; or, in the case of a waiver, by the party against whom enforcement of any such waiver is sought. No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of either party to exercise any right hereunder in any manner impair the exercise of any such right accruing to it thereafter.

    2.3    Headings; Interpretive Matters. The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof. No provision of this Agreement will be interpreted in favor of, or against, any of the parties hereto by reason of the extent to which any such party or its counsel participated in the drafting thereof or by reason of the extent to which any such provision is inconsistent with any prior draft hereof or thereof.

    2.4    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns. No party may assign this Agreement or any rights or obligations hereunder without the prior written consent of each of the other parties.

    2.5    No Third-Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective heirs, beneficiaries, successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

    2.6    Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without regard to the principles of conflicts of law thereof. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any

CONFIDENTIAL    GS 002837

transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consent to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices (set forth on the signature page) to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.

    2.7    Execution. This Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature page were an original thereof.

    2.8    Severability. In case any one or more of the provisions of this Agreement shall be invalid or unenforceable in any respect, the validity and enforceability of the remaining terms and provisions of this Agreement shall not in any way be affecting or impaired thereby and the parties will attempt to agree upon a valid and enforceable provision which shall be a reasonable substitute therefor, and upon so agreeing, shall incorporate such substitute provision in this Agreement.

    2.9    Legal Fees. The Sellers, collectively, will reimburse Bravia for up to $25,000 of Bravia's legal fees in structuring Bravia and documenting the matters contemplated by this Agreement.

    2.10    Liability. Each Seller, severally and not jointly, shall be liable for any amounts owing under this Agreement in proportion to its pro rata entitlement to the proceeds of the Sale.

    2.11    Term. This Agreement may be terminated by either party if the Sale has not been consummated by December 31, 1999.

    2.12    Survival. Provision 2.9 shall survive the termination of this Agreement.

    2.13    [Other Agreements. Are there other incentive agreements that need to be terminated?]

CONFIDENTIAL    GS 002838

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

BRAVIA

By:

Name: *BHARAT BHISE*

Title: *President*

Address:

QUANTUM INDUSTRIAL PARTNERS LDC

By:

Name:    MICHAEL C. NEUS

Title:    Attorney-In-Fact

Address:

S-C AVIATION INVESTMENTS, INC.

By:

Name:

Title:

Address:

WINSTON PARTNERS II LDC

By:

Name:    Peter Hurwitz

Title:    ~~Manager~~    *Attorney-in-fact*

Address:

**CONFIDENTIAL    GS 002839**

WINSTON PARTNERS II LLC , by
Chatterjee Advisors LLC

By: _____

Name:     Peter Hurwitz

Title:     Manager

Address:


WINSTON PARTNERS, L.P.

By:     Chatterjee Fund Management, L.P.,
       its General Partner

       By:     Purnendu Chatterjee,
             its General Partner

       By: _____

       Name:     Peter Hurwitz

       Title:     Attorney-in-Fact

       Address:


PURNENDU CHATTERJEE

By: _____

Name:     Peter Hurwitz

Title:     Attorney-in-Fact

Address:

031011.0024 100457v6

TOTAL P.13

CONFIDENTIAL    GS 002840

STATE OF NEW YORK

ss.:

COUNTY OF NEW YORK

RAYMOND Q. SPERLING, being duly sworn, deposes and says: that

deponent is not a party to the action, is over 18 years of age and resides at 350 Fifth Avenue,

Suite 6215, New York, New York 10118.  That on the 7th day of July, 2006 deponent served

the within DECLARATION OF DANIEL EULE upon:

> Violet Elizabeth Grayson, Esq.
> Attorney at Law
> 270 Ninth Avenue
> San Francisco, California 94118
>
> shroux1@aol.com
>
> Attorney for Plaintiff Jet Star Enterprises Ltd.

Lauren C. Gould, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, New York 10022

lauren.gould@bingham.com

Attorneys for Defendants Deutsche Bank
Trust Company Americas, Morgan
Stanley CS Aviation Holdings, LLC, MB
Statutory Trust, and Bingham McCutchen
LLP

David A. Piedra, Esq.
Morrison Cohen LLP
909 Third Avenue
New York, New York 10022

dpiedra@morrisoncohen.com

Attorneys for Defendant Pernendu
Chatterjee (local counsel)

Dustin F. Hecker, Esq.
Posternak Blankstein & Lund, LLP
The Prudential Tower
800 Boylston Street
Boston, MA 02199-8004

dhecker@pbl.com

Attorneys for Defendant Pernendu
Chatterjee (Lead Counsel)

John I. Karesh, Esq.
Vedder Price
805 Third Avenue
New York, New York 10022

jkaresh@vedderprice.com

Attorneys for Defendant Wells Fargo
Bank Northwest, N.A.

by depositing a true copy of same enclosed in a post-paid wrapper, in an official depository

under the exclusive care and custody of the U.S. Postal Service within New York State;

RAYMOND Q. SPERLING

Sworn to before me this

7th day of July, 2006

Notary Public

GERALDINE PERRY
Notary Public, State of New York
No. 01PE487-9187
Qualified in N—— County
Commission Expires Dec. 1, 1—— 2006