```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
Jet Star Enterprises, Ltd.,                   :
                                              :
        Plaintiff,                            :       05 Civ. 6585 (HB)
                                              :
        -against-                             :       OPINION & ORDER
                                              :
George Soros, Pernendu Chatterjee,            :
Deutsche Bank Trust Company                   :
Americas, and the MB Statutory Trust,         :
                                              :
        Defendants.                           :
-------------------------------------------------------X
```
**Hon. Harold Baer, Jr., District Judge:**

Plaintiff, Jet Star Enterprises Ltd. ("Jet Star") brought this action for, *inter alia*, intentional and constructive fraudulent conveyance and unjust enrichment[1] against defendants George Soros ("Soros"), Pernendu Chatterjee ("Chatterjee"), Deutsche Bank Trust Company Americas and the MB Statutory Trust (collectively, "Deutsche Bank").[2] On July 27, 2006, the parties appeared before me for oral argument on defendants' motion for summary judgment. For the reasons that follow, Deutsche Bank's motion is GRANTED and Soros and Chatterjee's motions are GRANTED in part and DENIED in part.[3]

---

[1] Although plaintiff's first amended complaint recites additional causes of action, plaintiff has elected to withdraw those claims not addressed in this Order. (Pl.'s Memorandum in Opposition to Motion for Summary Judgment ("Pl.'s Mem."), at 1 n.1).

[2] In addition, plaintiff originally sued Wells Fargo Bank Northwest, N.A. ("Wells Fargo"), Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), Bingham McCutcheon LLP, and Sidley Austin Brown & Wood LLP ("Sidley Austin"). By Order dated February 15, 2006, I dismissed all claims against Akin Gump, Bingham McCutcheon and Sidley Austin. By stipulation dated May 8, 2006, plaintiff settled its claims against Wells Fargo.

[3] At the conclusion of oral argument, I granted Deutsche Bank's motion with respect to plaintiff's unjust enrichment claims, but denied the motion with respect to plaintiff's fraudulent conveyance claims. However, I noted that "[t]here may be . . . other claims that I'll dismiss, but . . . because we have a September trial, it seemed wise for me to make sure that everybody knew where they were." (Tr. at 56). Upon further review of the parties' submissions and the relevant authority, I have concluded that Deutsche Bank is entitled to judgment as a matter of law.

1

## FACTUAL BACKGROUND

The facts set forth below are taken from the testimony and exhibits submitted in connection with this motion. This action arises out of a prior litigation between Jet Star and CS Aviation, a commercial aircraft management company (hereinafter referred to as the "Jet Star I litigation"). Jet Star contracted with CS Aviation to buy several aircraft. After Jet Star had made several payments, and received one plane in return, the deal went south. Jet Star sued CS Aviation and, in the midst of discovery, Sidley Austin (which had been representing CS Aviation and its codefendant Wells Fargo) withdrew from the litigation due to unpaid fees. On July 15, 2003, a default judgment was entered against CS Aviation and Wells Fargo in the amount of $3,432,867. It is plaintiff's attempt to collect on that judgment that precipitated the instant suit.

According to plaintiff, the Jet Star I judgment became collectible on July 25, 2003. Just before the judgment went "live," the defendants effectively shut down CS Aviation. Soros and Chatterjee, longtime partners in a variety of investments, had started CS Aviation in 1994. Soros invested capital while Chatterjee managed the investment and served as CS Aviation's sole shareholder. In 1998, Soros and Chatterjee parted ways. They agreed that control of CS Aviation would be transferred to Soros Funds Management LLC ("SFM"). However, Chatterjee remained, on paper, CS Aviation's sole shareholder. Soros began operating CS Aviation through SFM's private equity division.

CS Aviation was in the business of leasing and selling commercial aircraft. The aircraft themselves were owned by trusts. CS Aviation managed the aircraft pursuant to management agreements with the trusts' beneficiaries. Legal title to the trusts was held by Wells Fargo. The beneficial owners of the trusts were a series of holding companies (hereinafter referred to as the "LLCs") controlled by Soros, Chatterjee and various affiliated investment funds. In 1999 (after Soros had tried, unsuccessfully, to sell CS Aviation) Deutsche Bank, acting as administrative agent for a syndicate of lenders, loaned the LLCs approximately $210 million to finance upgrades to the aircraft. The loan was secured by various forms of collateral including: 1) mortgages on the aircraft themselves; 2) a security interest in the LLCs' equity; and 3) a security interest in certain

bank accounts at Deutsche Bank into which the aircraft lease proceeds were deposited (the "Lease Accounts").

After September 11, 2001, the aircraft industry experienced a downturn. In January of 2003, the LLCs defaulted on their payments under the Deutsche Bank loan. In the spring of 2003, Sidley Austin notified CS Aviation of its intent to withdraw from the Jet Star I litigation. Neither CS Aviation, SFM, nor Deutsche Bank took any action to prevent the default.[4] On July 25, 2003, Deutsche Bank entered into an "Acceptance Agreement" with its borrowers, taking equity interests in certain LLCs in partial satisfaction of the outstanding loan. Deutsche Bank placed these assets in a trust (the "MB statutory trust"). Deutsche Bank did not formally foreclose on the aircraft.

Receipt of the equity interests in the aircraft holding LLCs, the cash in the Lease Accounts, and funds held in the LLCs' names at Natexis Bleichroeder ("Bleichroeder") bank, was deemed to satisfy only $10,000 of the $147 million dollars outstanding on the Deutsche Bank loan. The Acceptance Agreement also terminated all CS Aviation employees. The management of the aircraft (as well as the services of all former CS Aviation employees except for its president, Jim Walsh) were transferred to a new entity, Windshear Leasing, that was set up by Deutsche Bank. For several months after the closing, Windshear operated out of the same offices at SFM's headquarters that had been previously occupied by CS Aviation. In addition, approximately $600,000 of CS Aviation's money was transferred to an escrow account at Akin Gump to pay final expenses, including severance payments to CS Aviation employees and Akin Gump's fees.

The Acceptance Agreement provided that Deutsche Bank would assume "exclusive control" over all aspects of the Jet Star I litigation, and retain the right to any recovery from that litigation. However, the agreement also provided that Deutsche Bank would assume no duties or obligations to CS Aviation with respect to the Jet Star I litigation. In addition, a separate litigation was then pending in this District between Wells Fargo, as trustee of certain aircraft holding trusts,[5] and TACA Airlines (the

---

[4] Nor did any of these entities ever move to vacate the default. Wells Fargo, however, did move (unsuccessfully) to vacate the default judgment entered against it in the Jet Star I litigation.
[5] The aircraft, and trusts, involved in the TACA litigation were distinct from those involved in the Jet Star I litigation.

3

"TACA litigation"). Pursuant to the Acceptance Agreement, Deutsche Bank received the right to any proceeds from the TACA litigation. In June 2003 (prior to the execution of the Acceptance Agreement), a $32 million judgment had been entered in favor of Wells Fargo in the TACA litigation. Ultimately, Deutsche Bank successfully collected $23 million dollars from that judgment. However, when plaintiff attempted to collect on its default judgment against CS Aviation, it discovered that CS Aviation was no more.

## DISCUSSION

A court will not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 250 (1986). In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities, and draw all inferences, against the moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (*per curiam*); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987). However, a disputed issue of material fact alone is insufficient to deny a motion for summary judgment, the disputed issue must be "material to the outcome of the litigation," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### A. Fraudulent Conveyance

To prove a claim for constructive fraudulent conveyance under New York law,[6] plaintiff must show that it is an unsatisfied judgment creditor of the transferor, and that a transfer of assets was made from the judgment debtor without fair consideration. See Neshewat v. Salem, 365 F. Supp. 2d 508, 518-19 (S.D.N.Y. 2005); N.Y. Debtor and Creditor Law ("N.Y. DCL") § 273. The question of fair consideration is generally one

---

[6] All parties apply New York law to plaintiff's fraudulent conveyance claims, and indeed plaintiff specifically references the relevant provisions of the New York Debtor and Creditor Law in its complaint. In any case, it is apparent that New York law applies because CS Aviation was based in New York and the transfers that gave rise to this action occurred in New York.

4

of fact. Id. at 519. Under N.Y. DCL Section 273, the intent of the transferor is irrelevant. Id. If successful, a creditor may recover a money judgment in the amount of the fraudulent conveyance against either the transferee of the assets or a "beneficiary" of the conveyance. Id. at 522. To prove an intentional fraudulent conveyance, plaintiff must show "'actual intent . . . to hinder, delay or defraud . . . present or future creditors.'" RTC Mortgage Trust v. Sopher, 171 F. Supp. 2d 192, 200 (S.D.N.Y. 2001) (quoting N.Y. DCL § 276). Where such intent is proven, "the conveyance will be set aside regardless of the adequacy of consideration exchanged." Id.

**1. Deutsche Bank**

Plaintiff identifies several assets that it contends were fraudulently conveyed to Deutsche Bank in connection with the July 25, 2003 closing. These assets include: 1) approximately $3.3 million in accounts at Bleichroeder; 2) approximately $740,000 on deposit in the LLCs' Lease Accounts; 3) the right to collect Wells Fargo's judgment in the TACA litigation; and 4) certain "expert personnel, intellectual property and chattel" of CS Aviation. With the exception of the latter, none of these assets were conveyed directly from CS Aviation to Deutsche Bank. Rather, the assets were (at least nominally) held by the LLCs at the time of the closing.[7]

In certain limited circumstances, courts may deem separate transfers to constitute a "single, integrated transaction" in applying fraudulent conveyance standards. Orr v. Kinderhill Corp., 991 F.2d 31, 35 (2d Cir. 1993) ("where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications") (internal quotation omitted). However, "the transferee in the leg of the transaction sought to be voided must have actual or constructive knowledge of the entire scheme that renders [its] exchange with the debtor fraudulent." HBE Leasing Corp. v. Frank, 48 F.3d 623, 635 (2d Cir. 1995). "Constructive knowledge of fraudulent schemes will be attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make such inquiry." Id. at 636. This "knowledge requirement" is designed to "protect[] innocent

---

[7] The TACA judgment was entered in favor of Wells Fargo, as trustee of certain aircraft-owning trusts of which the LLCs were beneficiaries. As noted above, the trusts (and aircraft) at issue in the TACA litigation were distinct from those at issue in the Jet Star I litigation.

5

creditors or purchasers for value who have received the debtor's property without awareness of any fraudulent scheme." Id.

In addition, "the satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property." In re Sharp Int'l Corp., 403 F.3d 43, 54 (2d Cir. 2005) (internal quotation omitted). Thus, "a mere preference between creditors does not constitute bad faith." Id. Furthermore, it is irrelevant that "the preferred creditor knows that the debtor is insolvent." Id. As the Second Circuit explained in Sharp:

> A conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another. It is of no significance that the transferee has knowledge of such insolvency. Nor is the transfer subject to attack by reason of knowledge on the part of the transferee that the transferor is preferring him to other creditors, even by a secret agreement to that effect."

Id. at 54-55 (quoting Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A., 191 A.D.2d 86, 90-91 (1st Dep't 1993).

The Bleichroeder funds, Lease Account monies (and arguably the proceeds from the TACA judgment) belonged to the LLCs' rather than to CS Aviation at the time of the July 25, 2003 closing. To sustain a claim for fraudulent conveyance against Deutsche Bank, plaintiff must show not only that these assets were transferred from CS Aviation to the LLCs for less than fair consideration (or with actual intent to defraud), but also that Deutsche Bank had "constructive knowledge" that the assets were fraudulently conveyed. To this end, plaintiff has submitted evidence of communications between Deutsche Bank's counsel and Soros' attorneys that evince an awareness of the impending default judgment against CS Aviation and a desire to foreclose quickly on the LLCs' loan. (See Grayson Dec., Ex. 25). However, awareness of CS Aviation's insolvency, or of preferential payments to Deutsche Bank (a secured creditor), does not constitute "constructive knowledge" of any scheme to defraud. See Sharp, 403 F.3d at 54.

It bears emphasis that CS Aviation was not even Deutsche Bank's debtor. Rather, Deutsche Bank was a secured creditor of the LLCs. There is no evidence that Deutsche Bank had notice that CS Aviation (plaintiff's judgment debtor) had fraudulently transferred assets to the LLCs prior to the July 25, 2003 closing. Plaintiff relies on a

March 2003 transfer of funds from CS Aviation to the LLCs' account at Bleichroeder. However, even if this transfer was made without fair consideration, or with actual intent to defraud, there is no evidence that Deutsche Bank had notice of that fraud. Similarly, there is no evidence that Deutsche Bank had notice that CS Aviation had a legitimate claim to any proceeds from the TACA litigation. Therefore, the July 25, 2003 transfers from the LLCs to Deutsche Bank cannot constitute fraudulent conveyances.[8]

Finally, plaintiff argues that Deutsche Bank should be liable for "expert personnel, intellectual property and chattel" fraudulently conveyed from CS Aviation to Windshear Leasing, the entity that replaced CS Aviation as manager of the fleet. In essence, plaintiff seems to argue that CS Aviation had some value as a "going concern" that was transferred fraudulently to Windshear. While most CS Aviation employees did begin work for Windshear immediately after the closing, they did so of their own accord and, presumably, were paid for their services. In addition, Windshear entered into management agreements with the LLCs (just as CS Aviation had) whereby Windshear managed the aircraft in return for certain fees. While it is possible that, by effectively taking over where CS Aviation left off, Windshear reaped some vestigial "goodwill" that CS Aviation had sown in the marketplace, the precise contours of any such benefit are no more than gossamer and therefore fail to constitute an "asset" fraudulently conveyed.[9] Thus, while the apparently sudden transformation of CS Aviation to Windshear was understandably frustrating to the plaintiff, and even suspicious, discovery has revealed no tangible assets conveyed in the process. Consequently, I must dismiss the fraudulent conveyance claims against Deutsche Bank.

### 2. Soros and Chatterjee

Plaintiff has failed to demonstrate that Soros or Chatterjee received any assets from CS Aviation or benefited from the transfer of any assets to Deutsche Bank. Soros

---

[8] Plaintiff also cites to certain statements by James Walsh (CS Aviation's former president) during his deposition in which Walsh opined that CS Aviation may have had between $2 and $3 million dollars in cash just prior to the July 25, 2003 closing. (Grayson Dec., Ex. 14 at 63-65). However, Walsh immediately clarified his testimony and stated that those funds may have actually resided in the LLCs' accounts. (Gould Reply Dec., Ex. A at 66). Plaintiff, who has meticulously examined CS Aviation's bank statements, has cited no cash assets transferred directly from CS Aviation to Deutsche Bank.
[9] After all, it appears that CS Aviation had produced disappointing returns for several years prior to the closing.

7

and Chatterjee were not beneficiaries of the transfers to Deutsche Bank because plaintiff has produced no evidence that Soros or Chatterjee guaranteed the LLCs' loan. Plaintiff argues that Soros and Chatterjee directly benefited from the transfer of approximately $600,000 from CS Aviation to the Akin Gump escrow account. The bulk of these funds were distributed to CS Aviation's employees as severance payments. However, plaintiff has produced no evidence that Soros or Chatterjee were obligated to make severance payments to CS Aviation employees.[10] The remainder of the escrowed funds went to pay: 1) Akin Gump's fees; 2) Wells Fargo's legal bill; and CS Aviation's final rent bill for leased space at SFM's headquarters. To the extent that Soros or Chatterjee personally benefited from any of these payments, plaintiff has produced no evidence that these transfers were made without fair consideration or with an intent to defraud.[11]

### B. Unjust Enrichment

To succeed on a claim for unjust enrichment, plaintiff must show that the defendants received a benefit at plaintiff's expense, and that equity requires restitution. Onanuga v. Pfizer, 369 F. Supp. 2d 491, 498-99 (S.D.N.Y. 2005). In addition, plaintiff must have had direct dealings or some sort of quasi-contractual relationship with each defendant. See Reading Int'l v. Oaktree Capital Mgmt., 317 F. Supp. 2d 301, 334 (S.D.N.Y. 2003).

Plaintiff's unjust enrichment claims against Soros and Chatterjee fail for the simple reason that plaintiff has failed to demonstrate that Soros or Chatterjee received any benefit at plaintiff's expense. See Reading, 317 F. Supp. 2d at 334 n.24 ("[p]laintiffs have . . . failed to demonstrate that defendants . . . received a benefit of money or property belonging to the plaintiff") (internal quotation omitted). As set forth above, plaintiff has identified no CS Aviation assets received by Soros or Chatterjee in connection with the July 25, 2003 closing.

---

[10] Plaintiff also asserts that CS Aviation employees signed confidentiality agreements as a condition of their severance packages, but it is unclear what, if any, tangible benefit Soros or Chaterjee received as a result of these agreements.

[11] Plaintiff argues that Akin Gump's $25,000 bill to CS Aviation submitted in connection with the July 25, 2003 closing was a sham because the attorneys had originally billed the matter to Soros' personal client identification number. However, it is clear from the record that Akin Gump did indeed perform substantial work in connection with the negotiation of the Acceptance Agreement. Therefore, CS Aviation received the substantial value of its attorneys' services in exchange for the payment of these fees.

With respect to Deutsche Bank, plaintiff has failed to show the existence of "a contractual or quasi-contractual relationship. . ." Id. at 334. Plaintiff had no direct dealings with Deutsche Bank of any kind. Plaintiff argues that Deutsche Bank "affirmatively placed itself in privity with Jet Star" when, pursuant to the Acceptance Agreement, CS Aviation authorized Deutsche Bank to assume control of the Jet Star I litigation. (Bell Aff., Ex., G § I(5)).[12] However, plaintiff provides no authority for the notion that an agreement by a defendant in a lawsuit to cede control of that litigation to a third party creates a quasi-contractual relationship between that third party and the plaintiff in the underlying suit. "[P]laintiff['s] argument would remove the elements of unjust enrichment from the context in which they must be viewed: as an alternative to contract, where a contractual relationship has legally failed." Reading, 317 F. Supp. 2d at 333-34. Here, since there is no evidence that plaintiff had any "prior . . . business dealings with [Deutsche Bank] whatsoever[,]" plaintiff's claim for unjust enrichment fails as a matter of law. Id. at 334.

**C. Piercing the Corporate Veil**

Plaintiff also seeks a judgment that would allow it to pierce CS Aviation's corporate veil and reach Soros and Chatterjee personally. Under Delaware law,[13] "a court [may] . . . pierce the corporate veil . . . 'where there is fraud or where [it] is in fact a mere instrumentality or alter ego of its owner.'" Fletcher v. Atex, Inc., 68 F.3d 1451, 1457 (2d Cir. 1995) (quoting Geyer v. Ingersoll Publications Co., 621 A.D.2d 784, 793 (Del. Ch. 1992)). "To prevail under an alter ego [theory] . . . a plaintiff must show (1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness . . . [is] present.'" Fletcher, 68 F.3d at 1457 (quoting Harper v. Delaware Valley Broadcasters, Inc., 743 F. Supp. 1076, 1085 (D. Del. 1990)). To determine whether a parent and subsidiary operated as a "single economic entity," a court should consider:

---

[12] Of course, Deutsche Bank never actually appeared in that litigation.
[13] Delaware law applies to plaintiff's "veil-piercing" theory because CS Aviation was incorporated in Delaware. See Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) ("[U]nder New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders.") (internal quotations omitted).

> "whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a façade for the dominant shareholder."

In re Foxmeyer Corp., 290 B.R. 229, 235 (Bankr. D. Del. 2003) (internal quotation omitted). In general, the existence of an alter ego relationship is a question of fact. See Fletcher, 68 F.3d at 1458.[14]

Chatterjee is, and has always been, the sole shareholder of CS Aviation. (Chatterjee Aff. ¶ 8). Further, he has been a director of CS Aviation since its inception, and its sole director since "[s]ometime in about 2002." (Id. at ¶ 10). Chatterjee and Soros executed a "Restructuring Agreement" in 1999 whereby Chatterjee granted SFM "control of his investment" in CS Aviation. (Chatterjee, Aff. ¶ 20 & Ex. F at Ex. 3) The Restructuring Agreement also provided that "proceeds" from CS Aviation, and from a contemplated sale thereof, would be allocated according to a "profit sharing agreement" between Chaterjee and Soros. (Id., Ex. F at Ex. 3). An "Allocation Agreement" circulated in 1999 in connection with a potential sale of CS Aviation recited that CS Aviation was "wholly-owned by Chatterjee, 50% of the economic interest of which is shared with" SFM. (Grayson Dec., Ex. 16). From 1998 until 2000, and again from January 2003 until July 2003, CS Aviation leased office space at SFM's headquarters. (Walsh Aff. ¶ 26). One former CS Aviation employee testified that this space was shared with non-CS Aviation employees. (Grayson Dec., Ex. 1 at 144-45).

Soros, in a declaration submitted in support of his motion for summary judgment against Jet Star, explained the Restructuring Agreement between himself and Chatterjee as follows: "[w]ith respect to the aircraft leasing business,[15] the concept was that *I* would have complete control of the investment. After obtaining control of the investment, I

---
[14] In addition, plaintiff has the right to a jury trial on its veil-piercing claim. See WM. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 136 (2d Cir. 1991) ("Because the action for piercing the corporate veil appears to have its roots in both law and equity, and the nature of the relief sought here supports the conclusion that plaintiff's cause of action is legal in nature, it was entirely proper for the district court to submit the corporate disregard issue to the jury.")
[15] By "aircraft leasing business," Soros appears to refer to CS Aviation as well as the various aircraft holding companies (the "LLCs"). Soros attests that, until recently, he was unaware that there existed a separate aircraft management company known as CS Aviation. (Soros Dec. ¶ 8).

delegated responsibility for the supervision of the management of the business to . . . SFM's private equity team." (Soros Dec. ¶ 6) (emphasis added). Michael Pruzan, the SFM employee who directly supervised CS Aviation's operations, testified that he wasn't aware that Chatterjee was CS Aviation's sole shareholder and that he did not consult Chatterjee in connection with the management of the company. (Grayson Dec., Ex. 10 at 93-94). However, Jim Walsh, the former president of CS Aviation, attested that he reported to Chatterjee. (Walsh Aff. ¶ 7). Nonetheless, in an earlier deposition,[16] Walsh testified that he reported to Pruzan. (Grayson Dec., Ex. 15 at 33).

In his recent affidavit, Walsh stated that CS Aviation had regular board meetings. (Walsh Aff. ¶ 15). Chatterjee, however, seemed to equivocate on this point. He testified that there were "many meetings," some of which could be construed as "de facto" board meetings. (Grayson Dec., Ex. 2 at 213). No minutes from these "board meetings" have surfaced.

Plaintiff has adduced evidence that Soros, through his agents at SFM, disregarded the formal distinctions between CS Aviation and the aircraft owning LLCs. Pruzan testified that he was unsure whether he had ever heard of an entity known as "CS Aviation." (Grayson Dec., Ex. 10 at 18).[17] Walsh testified that CS Aviation would draw funds to pay its operating expenses from whichever LLC account had funds available, regardless of the specific terms of the aircraft management agreements. (Grayson Dec., Ex. 14 at 20-23). Walsh explained that, had the Jet Star I judgment come due while CS Aviation was still in operation, CS Aviation would have paid the judgment either from the accounts of the particular LLCs that owned the planes at issue in that litigation, or from other LLCs' accounts, depending on where the money could be located. (Id. at 81-82). If none of the LLC accounts had sufficient funds, CS Aviation would have "gone back to . . . George Soros and the Chatterjee Group and asked for an equity contribution to cover." (Id. at 82). Walsh also testified that CS Aviation's funds were "dividended up" to the beneficial owners of the aircraft on an "opportunistic" basis. (Id. at 25).

---

[16] Soros and Chatterjee object to the submission of Walsh's deposition testimony because it was taken in connection with the Jet Star I litigation, to which neither Soros or Chatterjee were a party. While that may bear on its admissibility at trial (see Fed. R. Civ. P. 32(a)(4)), the deposition is nonetheless a sworn statement and therefore cognizable on this motion.
[17] Later, Pruzan testified: "I believe that was the management company." (Grayson Dec., Ex. 10 at 25).

Here, I have concluded that plaintiff's fraudulent conveyance claims fail as a matter of law. In any case, plaintiff has not identified any egregious or wanton behavior on behalf of Soros or Chatterjee (or Deutsche Bank) that could support an award of punitive damages. Therefore, the defendants are entitled to judgment as a matter of law dismissing plaintiff's claim for punitive damages.

## CONCLUSION

For the foregoing reasons, Deutsche Bank's motion for summary judgment is GRANTED. Soros and Chatterjee's motion is GRANTED with respect to plaintiff's claims for unjust enrichment and fraudulent conveyance, but DENIED with respect to plaintiff's claim to pierce CS Aviation's "corporate veil." In addition, plaintiff's claim for punitive damages is hereby DISMISSED. The jury trial of this matter shall commence on September 11, 2006. All pre-trial materials must be submitted directly to chambers by September 5, 2006 .

**SO ORDERED.**
August 9, 2006
New York, New York

U.S.D.J.